UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| JACOB GRAY, Individually and on Behalf of All Others Similarly Situated, | : Case No. 1:19-cv-08528-JSR |
| Plaintiff, | : |
| -against- | : **CLASS ACTION** |
| WESCO AIRCRAFT HOLDINGS, INC., RANDY J. SNYDER, TODD RENEHAN, DAYNE A. BAIRD, THOMAS M. BANCROFT III, PAUL E. FULCHINO, JAY L. HABERLAND, SCOTT E. KUECHLE, ADAM J. PALMER, ROBERT D. PAULSON, JENNIFER M. POLLINO, and NORTON A. SCHWARTZ, | : **JURY TRIAL DEMANDED** |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

Lead Plaintiff Jacob Gray ("Plaintiff"), by and through his undersigned counsel, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel and review of publicly available sources as to all other allegations herein, as follows:

## SUMMARY OF THE ACTION

1.       This is a stockholder class action brought by Plaintiff on behalf of himself and all other similarly situated former public stockholders of Wesco Aircraft Holdings, Inc. ("Wesco" or the "Company") against Wesco and the former members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Wesco, the "Defendants") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and Securities and Exchange Commission

("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the acquisition of Wesco by Platinum Equity Advisors, LLC and its affiliates (collectively, "Platinum")[1] via a merger (the "Merger").

2.      On August 8, 2019, the Board caused Wesco to enter into an Agreement and Plan of Merger ("Merger Agreement") with Platinum, pursuant to which Wesco common stockholders received $11.05 per share for each share of Wesco stock they held (the "Merger Consideration"). As set forth below, the Merger Consideration was grossly inadequate and did not fairly compensate Wesco stockholders for their shares.

3.      On September 13, 2019, in order to convince Wesco's stockholders to vote in favor of the unfair Merger, Defendants authorized the dissemination of a materially false and misleading definitive proxy statement (the "Proxy"), in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

4.      Specifically, the Proxy contained several statements and valuation analyses that misled Wesco's stockholders with respect to: the legitimacy of the significantly reduced financial projections that Wesco management suddenly created in late-July 2019 (referred to as the "Updated Management Projections"); the value of their Wesco shares; and the purported fairness of the Merger Consideration.

5.      Between February and April 2019, Wesco management prepared *legitimate* projections, which actually reflected Wesco's expected future financial performance (referred to as the "Initial Management Projections"). The Initial Management Projections were approved by

---

[1]      The Merger Agreement was by and among Wolverine Intermediate Holding II Corporation ("Parent"), Wolverine Merger Corporation ("Merger Sub"), and Wesco. Parent and Merger Sub are indirect subsidiaries of funds managed by Platinum Equity Advisors, LLC. Pursuant to the Merger Agreement, Parent acquired Wesco in the Merger, with Merger Sub merging with and into Wesco and Wesco surviving the Merger as a wholly owned subsidiary of Parent.

the Board for use with bidders on April 8, 2019. As set forth below, the Initial Management
Projections, unlike the Updated Management Projections, were reasonably prepared and fully and
properly accounted for the future risks Wesco faced. Yet, in late-July 2019—just 3.5 months after
the Board approved the Initial Management Projections, and directly after receiving several
lowball offers—Wesco management suddenly decided to slash the Initial Management Projections
for nearly every single financial metric—including drastically for Free Cash Flow—in every single
year of the five year forecast period, as reflected in the following table:

| | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| **Total Revenue** | | *(in millions)* | | | |
| Initial Management Projections | 1,672 | 1,814 | 1,980 | 2,116 | 2,242 |
| Updated Management Projections | 1,672 | 1,761 | 1,852 | 1,943 | 2,038 |
| *% Change* | 0.00% | -2.92% | -6.46% | -8.18% | -9.10% |
| **Total Gross Profit** | | | | | |
| Initial Management Projections | 420 | 463 | 507 | 537 | 566 |
| Updated Management Projections | 418 | 434 | 457 | 485 | 508 |
| *% Change* | -0.48% | -6.26% | -9.86% | -9.68% | -10.25% |
| **Operating Income** | | | | | |
| Initial Management Projections | 120 | 177 | 213 | 226 | 238 |
| Updated Management Projections | 102 | 150 | 170 | 183 | 191 |
| *% Change* | -15.00% | -15.25% | -20.19% | -19.03% | -19.75% |
| **Net Income** | | | | | |
| Initial Management Projections | 46 | 90 | 123 | 139 | 151 |
| Updated Management Projections | 42 | 70 | 90 | 106 | 114 |
| *% Change* | -8.70% | -22.22% | -26.83% | -23.74% | -24.50% |
| **Adjusted Net Income** | | | | | |
| Initial Management Projections | 83 | 108 | 135 | 150 | 162 |
| Updated Management Projections | 95 | 88 | 102 | 117 | 126 |
| *% Change* | 14.46% | -18.52% | -24.44% | -22.00% | -22.22% |
| **Adjusted EBITDA** | | | | | |
| Initial Management Projections | 175 | 213 | 245 | 259 | 271 |
| Updated Management Projections | 174 | 187 | 203 | 216 | 224 |
| *% Change* | -0.57% | -12.21% | -17.14% | -16.60% | -17.34% |
| **Free Cash Flow** | | | | | |
| Initial Management Projections | 76 | 115 | 134 | 104 | 111 |
| Updated Management Projections | 69 | 55 | 89 | 87 | 90 |
| *% Change* | -9.21% | -52.17% | -33.58% | -16.35% | -18.92% |

6.     On May 2, 2019, Wesco's management announced the Company's second quarter 2019 financial results, and provided an update on its full fiscal year 2019 outlook. The Company's earnings per share and revenues both beat analysts' expectations. Management also *improved* its full year 2019 outlook as compared to the outlook it had given on January 31, 2019 in conjunction with the announcement of the Company's first quarter 2019 financial results. Management then reiterated the improved full year 2019 outlook on August 9, 2019, in conjunction with announcing the Company's third quarter results, which also beat analyst's revenue expectations. In other words, after management had prepared and the Board had approved the Initial Management Projections, management indicated that the Company's future financial outlook had improved from the previous quarter's expectations. Yet, just 3.5 months later, management **suddenly slashed the Company's projections, while contemporaneously telling the Board and the market that their outlook for the Company's future prospects had *improved* since the first quarter of 2019 and touting Wesco's strong financial performance and growth prospects. In other words, the reduction to the Initial Management Projections was not driven by any negative change to Wesco's future financial prospects, as nothing occurred after the Initial Management Projections were prepared that justified *any* reduction, let alone the significant reductions approved by Wesco management and the Board.**

7.     As set forth below, the Updated Management Projections were illegitimate and did not reflect the expected future financial performance of Wesco. Wesco management knew this, but nevertheless prepared the Updated Management Projections in late-July 2019 so that the Company's financial advisors had projections they could utilize to justify their fairness opinions, which were rendered a mere week after the Updated Management Projections were approved.

8.      The Proxy misled Wesco stockholders with respect to the purported fairness of the Merger Consideration, the value of their shares, and the legitimacy of the Updated Management Projections. Specifically, the Proxy contained the following materially false and/or misleading statements.

9.      **First**, the Defendants elected to include summaries of the valuation analyses Morgan Stanley and J.P. Morgan (the "Financial Advisors") conducted in conjunction with their fairness opinions on pages 55-71 of the Proxy along with "implied value per share" ranges, even though the Individual Defendants knew or should have known that those valuation analyses and value per share ranges were illegitimate and did not accurately reflect the implied value of the Company's shares and the fairness of the Merger Consideration. Indeed, the Individual Defendants knew that the financial advisors relied solely upon the illegitimate Updated Management Projections to conduct their valuations. The law did not require the Individual Defendants to obtain fairness opinions, and it certainly did not require them to obtain opinions based upon concocted financial projections that did not reflect Wesco's actual future financial prospects. And Section 14(a) of the Exchange Act and Rule 14a-9 prohibited them from including valuation analyses summaries in the Proxy that were materially misleading, which is precisely what they did.

10.     **Second**, the statement on page 50-51 of the Proxy citing the baseless fairness opinions as "positive factors" that supported the Board's determination to recommend that stockholders adopt the Merger Agreement and as a "reason for the Merger" was materially misleading because, from this statement, reasonable stockholders would understand that the Board believed that the Financial Advisors accurately analyzed Wesco's potential financial growth and concluded $11.05 to be fair consideration for a Wesco share. These facts that a reasonable investor would have taken from the challenged statement conflict with undisclosed facts or knowledge held

by Wesco management concerning the inaccuracy and flaws in the Financial Advisors' analyses. Defendants knew that the Financial Advisors' fairness opinions were prepared by utilizing the illegitimately lowered Updated Management Projections, and that, utilizing the legitimate Initial Management Projections, the implied per share value ranges for Wesco common stock would have significantly exceeded the Merger Consideration, reaching as high as $18.39 per share.[2]

11.     **Third**, the Proxy falsely or misleadingly stated that the significantly lower Updated Management Projections: (i) "were reasonably prepared on bases reflecting the best currently available estimates and judgments of management of the Company at the time prepared of the Company's future financial performance." (Proxy at 56); (ii) "were reasonably prepared based on assumptions reflecting the best currently available estimates and judgments by management as to the expected future results of operations and financial condition of the Company . . . ." (Proxy at 66). Additionally, the Proxy falsely or misleadingly stated that both the Initial Management Projections and the Updated Management Projections reflected variables, assumptions and estimates as to future events "that management believed were reasonable at the respective times the Management Projections were prepared[.]" Proxy at 75. These statements were materially false or misleading because, as set forth below, the Updated Management Projections were **not** actually prepared on a reasonable basis, did **not** reflect the best estimates and judgments of Wesco's management, and did **not** reflect Wesco's expected future financial performance as of the date they were prepared.

---

[2]     The average change made to the Free Cash Flows from the Initial Management Projections to the Updated Management Projections was -26.05%. By applying this same rate of change (-26.05%) to the Discounted Cash Flow Analysis implied per share values calculated by Morgan Stanley utilizing the lowered Updated Management Projections, we approximated the resulting implied per share value range as $12.44-$18.39.

12.     ***Fourth***, the statement on page 72 of the Proxy that the "Updated Management Projections represent an update of the Initial Management Projections to take into account trends in the industry and markets in which the Company operates and the recent performance of the business" and the bullets listed thereunder purporting to describe the "trends" that the Updated Management Projections "take into account" were false and/or misleading, because the Updated Management Projections were created solely for the purpose of providing the Financial Advisors with projections they could use to justify the otherwise unfair Merger Consideration. Indeed, the Updated Management Projections served no legitimate business purpose, as they were approved on August 1, 2019, a mere week before the fairness opinions were rendered and by which time the Board had made clear it was committed to finalizing a merger. Furthermore, as set forth below, the "trends" the Updated Management Projections were purportedly prepared to represent did not and could not actually justify the reductions to the Initial Management Projections, and such reductions were inconsistent with public statements made my Wesco management regarding the Company's future financial prospects.

13.     ***Fifth***, the Updated Management Projections themselves (set forth on page 74 of the Proxy) were materially false or misleading because, as set forth herein, they were not actually prepared on a reasonable basis, did not reflect the best estimates and judgments of Wesco's management, and did not legitimately reflect Wesco's expected future financial performance as of the date they were prepared.

14.     ***Sixth***, the statements indicating that the Board believed that the Merger and Merger Consideration were "fair to and in the best interests of" stockholders (Proxy at cover letter, 7, 21, 31, 49-54) were materially false or misleading. As set forth herein, the Defendants knew that the Merger Consideration undervalued stockholders' shares, and that the Financial Advisors' fairness

opinions were predicated on the illegitimately lowered Updated Management Projections that were entirely inconsistent with management's actual expectations about the Company's future prospects, and that, utilizing the legitimate Initial Management Projections, the implied per share values would have ranged significantly above the Merger Consideration.

15.     **Seventh**, the failure to disclose the "preliminary valuation analyses" the Financial Advisors performed and presented to the Board on August 1, 2019 (the "Preliminary Valuation Analyses") constitutes a material omission in violation of Rule 14a-9. Given that the Updated Management Projections were first approved by the Board at the same August 1, 2019 meeting during which the Financial Advisors presented their Preliminary Valuation Analyses, those analyses must have been predicated on the significantly higher and legitimate Initial Management Projections. Thus, if the Preliminary Valuation Analyses were disclosed, they would have illuminated the unfairness of the Merger Consideration and undercut the positive language in the Proxy touting the fairness of the Merger Consideration. Therefore, by disclosing solely the Financial Advisors' valuation analyses predicated on the Updated Management Projections, and withholding the Preliminary Valuation Analyses, the Proxy misled shareholders as to the value of their Wesco shares and the purported fairness of the Merger Consideration.

16.     **Eighth**, the Proxy omitted material information that was necessary for shareholders to appreciate a significant conflict of interest that impacted the strategic review and negotiation process. Specifically, the Proxy failed to disclose that Individual Defendant Renehan was engaged in discussions to keep his lucrative position as CEO with the combined post-Merger company. The Proxy cryptically stated that on August 1, 2019, "[t]he financial advisors summarized the key financial and other terms of Platinum's bid, which included an all-cash offer at a price of $10.42 per share, along with a request for a five-day exclusivity period, receipt of draft third quarter public

earning materials and discussions with Mr. Renehan and key members of the management team[,]" (Proxy at 46) without any explanation as to *what the requested discussion with Mr. Renehan concerned*. And the section of the Proxy purporting to identify the interests in the Merger held by the Company's officers and directors that were "different from" shareholders' interests (Proxy at 76-83) made no reference to Renehan maintaining his job as CEO of the post-Merger combined company. The Proxy was issued on September 13, 2019, and the shareholder vote was October 24, 2019. It defies credulity to believe that Platinum and Renehan did not discuss his continued employment before the shareholder vote, yet that material fact was hidden from shareholders. This significant conflict of interest aligned Renehan's interests with Platinum rather than the Company's shareholders.

17.     The materially false and misleading Proxy was an essential link in the consummation of the financially unfair Merger, as it was required in order to solicit Wesco's stockholders to vote in favor of the Merger. As a result of the materially false and misleading Proxy, stockholders were significantly shortchanged for their shares. Indeed, utilizing the legitimate Initial Management Projections would have caused the implied value per share ranges calculated in connection with the Discounted Cash Flow Analyses to exceed the $11.05 per share Merger Consideration. And the Discounted Cash Flow Analysis is widely regarded as the most accurate assessment of the value of stock, particularly in the context of a cash-out merger.

18.     Without the drastically-reduced Updated Management Projections prepared in late-July 2019—which was a mere 3.5 months after management had prepared and the Board had approved the much higher and legitimate Initial Management Projections which actually reflected management's best estimates of the Company's future financial performance, and immediately

following Platinum submitting its low-ball offer—the Financial Advisors would only have had one case of projections that resulted in implied valuation ranges above the Merger Consideration.

19.     The Merger Consideration was also significantly below the estimates various analysts said they expected shareholders to receive in conjunction with a merger in late-May 2019, when news first broke that Wesco was exploring strategic alternatives. One analyst at Suntrust wrote that Wesco could see a takeout multiple of 11x to 12x CY2020 EBITDA, representing a price of approximately **$17** per share. Another analyst at Citi wrote that Wesco could fetch up to **$18**, and that $16 to $17 per share seemed reasonable. And analysts' price targets remained up to $13 per share as of August 7, 2019.

20.     There was absolutely no need for Wesco to enter into a merger transaction in 2019 or the foreseeable future if bidders were unwilling to pay fair value. As discussed below, management had a strong stand-alone plan, and made various positive statements regarding the Company's future financial prospects in conjunction with announcing the Company's second quarter and third quarter 2019 financial results.

21.     The special meeting of Wesco stockholders to vote on the Merger was held on October 24, 2019. Based upon the materially misleading Proxy, a majority of Wesco's stockholders voted to approve the Merger, and the Merger closed on January 9, 2020. The materially false and misleading Proxy was an essential link in the consummation of the Merger, as the stockholder vote and resulting Merger could not have occurred without the dissemination of the Proxy.

22.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## PARTIES

23.     Lead Plaintiff was, at all relevant times, a stockholder of Wesco common stock.

24.     Defendant Wesco was a public company incorporated under the laws of Delaware, with principal executive offices located at 24911 Avenue Stanford, Valencia, California. Wesco's common stock traded on the NYSE under the ticker symbol "WAIR."

25.     Individual Defendant Randy J. Snyder was, at all relevant times, a director of the Company and Chairman of the Board.

26.     Individual Defendant Todd Renehan was, at all relevant times, a director of the Company and its Chief Executive Officer.

27.     Individual Defendant Dayne A. Baird was, at all relevant times, a director of the Company.

28.     Individual Defendant Thomas M. Bancroft III was, at all relevant times, a director of the Company.

29.     Individual Defendant Paul E. Fulchino was, at all relevant times, a director of the Company.

30.     Individual Defendant Jay L. Haberland was, at all relevant times, a director of the Company.

31.     Individual Defendant Scott E. Kuechle was, at all relevant times, a director of the Company.

32.     Individual Defendant Adam J. Palmer was, at all relevant times, a director of the Company.

33.     Individual Defendant Robert D. Paulson was, at all relevant times, a director of the Company.

34.     Individual Defendant Jennifer M. Pollino was, at all relevant times, a director of the Company.

35.     Individual Defendant Norton A. Schwartz was, at all relevant times, a director of the Company.

36.     The Individual Defendants referred to in ¶¶ 25-35 are collectively referred to herein as the "Individual Defendants" and/or the "Board", and together with Wesco they are referred to herein as the "Defendants."

## JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

38.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state."  *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court."  *Id.* at 1316.

39.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact

business in this District.  Indeed, Wesco's common stock traded on the New York Stock Exchange ("NYSE"), which is headquartered in this District.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases). Additionally, Wesco hired a proxy solicitor for the Merger, Mackenzie Partners, Inc., that is located in this District at 1407 Broadway, New York, NY 10018, and two financial advisors that are headquartered in this District. Furthermore, during the sales process, Wesco held "fireside chats" with nine potentially interested parties, management presentations, and numerous meetings at the offices of Morgan Stanley located in this District at 1585 Broadway, New York, NY 10036.

### CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other former public common stockholders of Wesco who were harmed by Defendants' actions alleged herein (the "Class"). Excluded from the Class are Defendants and their immediate family members.

41.     This action is properly maintainable as a class action because:

a)   the Class is so numerous that joinder of all members is impracticable. An aggregate of 99,749,063 shares of Wesco common stock were entitled to vote on the Merger, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of public stockholders of Wesco will be ascertained through discovery;

b)   there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i.     whether the Proxy contained any statement which, at the time and in the light of the circumstances under which it was made, was false or misleading with respect to any material fact, or omitted to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which became false or misleading, in violation of Section 14(a) and SEC Rule 14a-9;

ii.    whether the Individual Defendants violated Section 20(a) of the Exchange Act; and

iii.   whether Plaintiff and other members of the Class suffered damages as a result of the materially false and misleading Proxy and unfair Merger.

c)  Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d)  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e)  the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f)   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g)   a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## FURTHER SUBSTANTIVE ALLEGATIONS

### I.   Wesco's Pre-Merger Financial Performance, Strong Future Prospects, and the Strategic Review Process

42.   Wesco Aircraft is one of the world's leading distributors and providers of comprehensive supply chain management services to the global aerospace industry. The Company's services range from traditional distribution to the management of supplier relationships, quality assurance, kitting, just-in-time delivery, chemical management services, third-party logistics or fourth-party logistics and point-of-use inventory management. The Company offers one of the world's broadest portfolios of aerospace products, comprised of more than 550,000 active SKUs. The Company's products are categorized as hardware, chemicals, electronic components, bearings, and machined parts and tooling. The Company conducts its business through three reportable segments: the Americas; EMEA (Europe, Middle East and Africa); and APAC (Asian Pacific).

43.   The Company was founded in 1953 by Chairman and Individual Defendant Randy J. Snyder's father.

44.   In July 2006, global asset manager The Carlyle Group ("Carlyle") announced that it had reached a definitive agreement to acquire a majority ownership position in Wesco. The then-existing management team, led by Randy Snyder, retained a significant ownership position in the Company. Carlyle's acquisition closed in the third quarter of 2006.

45.     Prior to Wesco's initial public offering ("IPO") in July 2011, Carlyle owned approximately 83.8% of the Company's outstanding common stock. Following the IPO, Wesco shares began trading on the New York Stock Exchange under the ticker symbol "WAIR". Once publicly traded, Carlyle continued to divest its shares of the Company in chunks, until it got down to the 23.4% stake it owned prior to the Merger.

46.     In April 2017, Wesco announced the appointment of a new Chief Executive Officer and director, Todd S. Renehan, and a new Chief Operating Officer, Alex Murray.

47.     In September 2017, Wesco announced the appointment of a new Chief Financial Officer, Kerry A. Shiba.

48.     In May 2018, the Company announced the launch of its "Wesco 2020" initiative, which was designed to broaden and institutionalize improvements already made to its business during fiscal 2018, and to further improve the Company's service excellence, inventory management, productivity, and profitability.  Since first announcing the Wesco 2020 initiative, the Company and its management have indicated that they expect Wesco 2020 to deliver significant operational and financial benefits through footprint alignment, organizational refinement, productivity gains, and investment in critical capabilities to serve customers better.

49.     On June 21, 2018, PE Bidder B proposed to purchase the Company for $12.00 to $13.50 per share. After being rebuffed by the Board for presenting an inadequate price, PE Bidder B submitted a new proposal to purchase the Company for $14.00 to $15.00 per share. Again, the Company found the proposal to be inadequate and summarily dismissed it.

50.     Between August 2018 and April 2019, Wesco's stock price dropped from $13.95 to approximately $8.25.

51.     On August 16, 2018, Wesco shares fell approximately 7% as UBS analyst Myles Walton issued a "sell" rating. Walton noted that since its initial public offering in July 2011, Wesco's margins had collapsed from over 20% to a low of 6%. Walton further noted that while some of the margin erosion was self-inflicted by acquisitions and execution missteps, half was simply the evolution of returns in the aero distribution market. He stated that he expected Wesco to get margins back to around 10% from the most recent 8.5%, but not much beyond that. He further noted the competitive pressures Wesco faced in light of Boeing's acquisition of KLX Inc.

52.     **Despite the competitive pressure Wesco faced and the Company's shrinking margins, the average price target for the Company as of August 2018 was $13.00 per share.**

53.     That same day, the Company met with Platinum and had initial discussions about a combination between the two entities.

54.     On November 7, 2018, the Board met and decided to engage a financial advisor and begin the Company's sales process.

55.     On November 16, 2018, Wesco management announced the Company's fourth quarter and full year 2018 financial results. The Company's share price fell 8.1%, more than any full-day drop since August 2017, as it reported lower earnings than estimated. Adjusted earnings per share for the fourth quarter missed the lowest analyst estimate. In announcing the results, Company management cited to issues with pass-through drops in margins. Specifically, Wesco's CFO Kerry Shiba stated:

> Gross margin also increased slightly, reflecting higher hardware margins, partially offset by lower chemical margins. The chemical margin decline primarily reflects a greater mix of pass through revenue relative to the fee income. Gross margin decline of 110 basis points sequentially, primarily due to lower chemical margins, which reflects the same comment I just noted in the year-over-year comparison. . . The chemical margins in the quarter from Q3 to Q4 really accounted for the majority of the decline. And that – the primary driver behind that was the increase in pass through revenue. That was really the main driver of the decline – of the drop

in margins 3 to 4. . . . The drop in the percentage margin on chemical was the one area where margins declined, but it was a margin of impact, again, the phenomena of the relationship of the pass through revenues that caused us to occur.

56.     In its Form 10-K Annual Report filed with the SEC on November 16, 2018, Wesco also noted performance in its EMEA business segment. In comparing its year ended September 30, 2018 with its year ended September 30, 2017, the Company noted the following trends in its EMEA segment: Net sales for the EMEA segment increased $4.0 million, or 1.6%, to $262.1 million for the year ended September 30, 2018, compared with $258.1 million for the year ended September 30, 2017. The $4.0 million increase reflected higher chemical product sales, partially offset by a decline in Ad hoc sales and hardware Contract sales; Income from operations for the EMEA segment declined $7.2 million, or 28.7%, to $17.9 million for the year ended September 30, 2018, compared to $25.1 million for the year ended September 30, 2017. The $7.2 million decline in income from operations was comprised of a decrease in gross profit of $5.7 million and an increase in SG&A expenses of $1.5 million. Income from operations as a percentage of net sales was 6.8% for the year ended September 30, 2018, compared to 9.7% for the year ended September 30, 2017, a decrease of 2.9 percentage points; Net sales for the EMEA segment decreased $16.9 million, or 6.1%, to $258.1 million for the year ended September 30, 2017, compared with $275.0 million for the year ended September 30, 2016; Income from operations for the EMEA segment decreased $18.7 million, or 42.7%, to $25.1 million for the year ended September 30, 2017, compared to $43.9 million for the year ended September 30, 2016. Income from operations as a percentage of net sales was 9.7% for the year ended September 30, 2017, compared to 16.0% for the year ended September 30, 2016, a decrease of 6.3 percentage points. The decrease in income from operations was comprised of a $15.9 million decrease in gross profit and a $2.8 million increase in SG&A expenses. Average gross margins decreased 4.1 percentage

points and SG&A as a percent of net sales increased by 2.2 percentage points. The $15.9 million decrease in gross profit was partially due to a $5.9 million decrease due to negative foreign currency translation impact. The remaining $10.0 million decrease in gross profit was primarily driven by lower product margin, higher write downs of E&O inventory, higher freight and expedite costs, partially offset by the increase in sales on a constant currency basis. The 4.1 percentage point decline in gross margins was due primarily to a decrease in chemical margins, a decrease in ad hoc margins due to higher than usual margins in the prior year, an increase in write downs of E&O inventory and changes in product mix compared to the same period of the prior year. The Company also noted that consolidated average gross margins increased 0.4 percentage points, primarily due to higher margins on ad hoc sales and a stronger sales mix, partially offset by lower margins on chemical product sales, compared with the prior year. It also noted that the $5.7 million decline in gross profit for the EMEA Segment was primarily driven by lower contracts sales of hardware products and a weaker sales mix compared with the prior year. Average gross margins declined 2.6 percentage points, due primarily to a weaker sales mix and lower margins for hardware Contract sales and chemical product sales compared with the prior year.

57.    On January 9, 2019, the Board hired Morgan Stanley and J.P. Morgan as financial advisors to help sell the Company. The Board established an ad-hoc special committee of the Board (the "Strategic Alternatives Committee" or "SAC")—consisting of Individual Defendants Baird, Bancroft, Palmer, and Renehan—to oversee and administer the sales process. However, unlike most special committees which seek to isolate potential conflicts, the SAC was comprised of the four most conflicted directors who had the greatest motivation to pursue a sale, even if the prices offered did not reflect the Company's inherent value. Individual Defendant Baird is a Principal at Carlyle, and Individual Defendant Palmer is a Managing Director of Carlyle. Individual Defendant

Bancroft is the founder of Makaira Partners LLC ("Makaira Partners"), the Company's second largest shareholder, and currently serves as its Managing Member, Portfolio Manager and Chief Investment Officer. And Individual Defendant Renehan is the CEO of the Company and stood to cash in on over $7.5 million in golden parachute compensation as a result of the Merger.

58.     On January 24, 2019, the Board, Company management, and the Financial Advisors reviewed preliminary management projections and preliminary valuations of the Company.

59.     On January 31, 2019, Wesco management announced the Company's negative financial results for the first quarter of 2019. Investors were disappointed that while first quarter sales grew about 9% year over year, (faster than expected), the *cost* of those sales, increased more than 10%, and selling, general, and administrative expenses also grew faster than sales. Consequently, pre-tax income at Wesco declined more than 10%, to just $22.1 million. Wesco's improved earnings per share compared to the previous year were driven by the fact that it paid less income tax. Wesco investors also remained nervous about the impact that Boeing's acquisition of Wesco competitor KLX's aerospace solutions group in October 2018 will have on the long-term competitive dynamics in the industry. As a result of this news, Wesco share prices dropped 12.7%.

60.     Individual Defendant Renehan, Wesco's CEO, stated that management **continued to target mid-single digit percentage growth in net sales in fiscal 2019**.

61.     In conjunction with the earnings announcement, Wesco's management reiterated that the same problems that had caused the Company's significant stock price drop in the second half of 2018 continued to drag the Company's overall financial performance, including problems with performance in the company' EMEA (Europe, Middle East and Africa) business segment and problems with margins.

62.     A few days later, on February 5, 2019, the SAC met with Company management and the Financial Advisors and directed management to prepare the Initial Management Projections for use in the sales process. Between February and April 2019, the Company's management prepared the Initial Management Projections. **Accordingly, these projections were prepared directly <u>after</u> the Company had announced multiple quarters of negative results, primarily driven by poor performance in the Company's EMEA segment and margins related to hardware and chemicals. The Initial Management Projections therefore must have accounted for these trends that had been dragging down the Company's performance.**

63.     At a Board meeting on April 8, 2019, management reviewed the business, financial and strategic position of the Company, including the Initial Management Projections. The Board authorized the Initial Management Projections for use with potential bidders in the sales process. The Board directed the Company's management, together with the Financial Advisors and in consultation with SAC, to initiate discussions with the potential buyers.

64.     Between April and May 2019, the Company entered into confidentiality agreements with 14 potential bidders. Each of these bidders received access to the Initial Management Projections.

65.     On May 2, 2019, Wesco management announced the Company's positive financial results for the second quarter 2019, including free cash flow for the quarter of $20 million, and **increased guidance from mid- single digit growth to mid to <u>high</u> single-digit percentage growth in net sales in fiscal 2019**. During the second quarter 2019 earnings conference call, Individual Defendant Renehan and Wesco CFO Kerry Shiba made the following statements:

> Financial results in the fiscal 2019 second quarter reflect continued improvement in most areas of the business. Sales were robust, quotes were strong and bookings were higher, as we took advantage of a growing market. In addition, our Wesco

2020 initiatives accelerated, and SIOP processes drove more efficient inventory management and increased cash flow.

. . .

Adjusted EBITDA increased year-over-year and represented our best quarter in two-and-a-half years, primarily due to continued improvement in the Americas. I'll discuss our segment results in a few minutes.

We continued to focus on strengthening inventory management to support sales growth with greater efficiency and reduced investment need. As a result, net cash provided by operating activities and free cash flow increased significantly in the second quarter.

. . .

This was one of the strongest quarters for new business that we've seen in more than two years, proof that customers continue to recognize Wesco's enduring value proposition. We also recently renewed a long-term agreement with one of the largest defense prime contractors in the world, extending products and services under the agreement for several more years.

Turning next to expenses, we continued to carry temporarily higher costs associated with the execution of Wesco 2020 initiatives and invested to support our growth in the second quarter. These higher expenses were partially offset by cost savings achieved thus far through Wesco 2020 initiatives. At the same time, we remain vigilant controlling discretionary spending in all areas. . . . We continue to expect temporary costs associated with Wesco 2020 execution to decline significantly by the end of fiscal 2019.

. . .

From a financial perspective, we realized more cost savings in the second quarter as a result of Wesco 2020 execution. Through the second quarter, these cost savings primarily have offset investments made to support our growing business. We expect benefits to increase as we move closer to our goal of achieving during fiscal 2020 at least $30 million of cost efficiency improvements since we began the process.

. . .

Looking at the various operating income drivers, gross profit increased $3 million year-over-year, primarily reflecting higher sales volume, *partially offset by a 160-basis point decline in gross margin. The lower gross margin primarily was due to the decline in our EMEA region, **driven by the same issues discussed last quarter.***

. . .

22

We still expect free cash flow in fiscal 2019 to be significantly higher than fiscal 2018, despite the increased rate of capital spending, with improvement driven by continued inventory reductions in the second half of the year.

. . .

Our second quarter results represent further progress, expanding our business and executing Wesco 2020. We grew the topline at a robust pace, with the strongest results seen in the Americas. We're winning new business and renewing contracts at a solid pace, reflecting Wesco's enduring robust value proposition. Our Americas business is gaining momentum, and we're confident in our ability to fix the issues in EMEA.

We quickened the pace of Wesco 2020 execution, which is driving greater benefits. We continue to expect benefits to increase in the second half of fiscal 2019 and into fiscal 2020 as our execution accelerates. We remain confident in our ability to generate at least $30 million in annualized pretax benefits through Wesco 2020, with full realization still expected during fiscal 2020. *Based on the strong sales momentum achieved in the first half of the year,* ***we're now targeting mid- to high single-digit percentage growth in net sales in fiscal 2019.*** We expect that this growth will continue to be driven by new business and existing contracts as well as higher ad-hoc sales.

*Increased sales volume, Wesco 2020 benefits and expense leverage still are anticipated to drive a high single-digit percentage increase in adjusted EBITDA in fiscal 2019.* ***However, because of EMEA's performance, we're keeping our gross margin assumptions in the second half of fiscal 2019, consistent with the first half of the year.***

As Kerry mentioned, we're confident that net cash provided by operating activities and free cash flow in fiscal 2019 will be significantly higher than fiscal 2018. *We expect that our SIOP process improvements will continue and that the cash flow generated in the second quarter will accelerate in the second half of the year.*

. . .

Louis Raffetto
This is actually Lou Raffetto on for Myles. So just wanted - the inventory drawdown, was there anything one-time in nature? You haven't seen that sort of number on a quarterly basis very often, especially not in the second quarter.

Todd Renehan
It's not one-time. It's not one-time. Our SIOP processes are improving and continue to mature. We are, like we talked about in the comments, strengthening the leadership. We refocused functions. We're improving our forecast accuracy,

especially around receipts. We're using our tools better, we're improving inventory turns. And that's all led to lower inventory in Q2. And we are very confident that we can continue to build on the momentum and improve that even further, with a decline in inventory in the second half of the year, which will drive an increase in operating and free cash flow also in the second half of the year.

Louis Raffetto
And then, I guess with the EMEA weakness, are you guys actually spending more on Wesco 2020 than you originally, or is that sort of - are those costs being absorbed elsewhere?

Todd Renehan
EMEA and costs in Wesco 2020 are kind of separate issues. What we're seeing in EMEA is really more about sales generation, supply chain management, completely internal issues that we're confident that we can fix, separate of Wesco 2020. The Wesco 2020 initiatives are actually more - they're heavier and more complicated probably here in the U.S. than they are in EMEA right now. So we have work to do in EMEA, but it's outside of Wesco 2020.

. . .

Michael Ciarmoli
Maybe, Todd, just new business. You said it was a phenomenal quarter. Can you just elaborate in terms of what you think is driving that? Obviously, we've got a lot of commercial rate increases on the aircraft programs. DoD, it seems like a lot of money's flowing. I don't know if there's any that's attributed to KLX and just market disruption or more opportunities in the marketplace. But any color around what you think is driving a lot of that new business?

Todd Renehan
Yes. I think it's both internal and external. I think we definitely have some wind in our sails from what's going on in the marketplace, with lead times stretching out a little bit, commercial rates improving on some platforms. And we have some fantastic positions on big platforms out there that are growing. Defense spending and budgets are up. So we're definitely - and I think, because we're doing a much better job from a performance standpoint, we're able to capitalize on those tailwinds more than maybe we have done in the past.

I also firmly believe that internally, we're doing a better job with an overall go-to-market strategy, both internal and external sales, to proactively attack the marketplace, capitalize on the disruption that's going on out there, especially with our largest competitor. So there's a lot of good things happening right now, some in the market and more for us.

Michael Ciarmoli

And then, just last one. Kerry, *I know you expect free cash flow to be significantly better this year. I mean, you did $12 million last year. Can you maybe frame significantly - I mean, $15 million, $16 million would be a big improvement.* But can you give any color? Or are you just not prepared to kind of frame that with an actual range?

Kerry Shiba

Yes, we are going to choose to not give you a quantitative range on that one, Mike. But we do feel very, very good about the progress we're making. A little bit of a wildcard for us is with the amount of sales growth we continue to see, just the timing at the end of the year, what of that sales growth is sitting in receivables versus the continued progress we expect to see on our inventory. And a pretty good wildcard around a year-end cutoff. So that's why we tend to at this stage avoid that for you. And the rate of growth that we continue to see in the business will be one of those variables.

But we are still very, very confident, especially because of the progress we're making in our SIOP processes, as Todd described, that we're going to continue to accelerate momentum that you've seen us achieve as far as just nominal free cash flow in the second quarter. *And we're looking forward to a good second half overall.*

. . .

Gautam Khanna

And just to expand upon your comments on EMEA. So what specifically is going on there that is within your control? Is it just a lack of pricing discipline? Or what specifically is the problem? And what specifically is the solution you're implementing?

Todd Renehan

Sure. *So overall specifically, it's gross margin and, more specifically, hardware margin. We have had some strategic contract renewals that we retained and took lower margin to do it.* It was the right decision to do. Along with that, we've had some volume declines with other customers. And then, maybe the third thing is there's been a decline in chemical distribution volume. The issues and actions that we're taking broader are around sales generation and supply chain management. By sales generation - but first, I'd say internal issues. *Nothing wrong with the marketplace; all positive things for us that - we can fix this. Temporary, and will be fixed.*

From a sales efficiency and productivity standpoint, which will be a quicker fix, we're talking actions around process improvements, metrics, accountability, sales management, increasing activity, increasing pipelines, driving win rates both inside sales and outside sales. And we're already seeing bookings, which is a leading indicator, improving around the sales efficiency. *On the supply chain management side - also fixable, but maybe take a little bit longer* - is improving the backlog that

we have, the amount of backlog that's tied up with suppliers; continuing to improve our COGS savings and negotiate better long-term agreements with specific suppliers. And that will just - those are maybe a lead time away from seeing that in the P&L. So that's what's happened there. And that's what we are doing to turn things back around.

66.    As a result of the positive second quarter earnings announcement, Wesco's stock price jumped significantly, increasing over 25% from $8.38 per share to $10.53 per share, as illustrated by the chart below:



67.    In late-May 2019, news first broke that Wesco was exploring strategic alternatives. One analyst at Suntrust wrote that Wesco could see a takeout multiple of 11x to 12x CY2020 EBITDA, representing a price of approximately **$17.00 per share**. **The analyst noted that his $17 per share estimate included the benefits from Wesco 2020, and that a minimum multiple of 11x-12x CY2019 EBITDA based on Boeing's recent purchase of KLX would yield a price**

**of $15 per share. Another analyst from Citi wrote that Wesco could fetch up to $18 per share based on the multiple KLX obtained, and that $16 to $17 per share seemed reasonable.**

68.     On June 5, 2019, PE Bidder G, PE Bidder B and Platinum each made grossly inadequate initial cash offers to acquire the Company. PE Bidder G submitted a cash offer with a purchase price of $12 per share. PE Bidder B submitted a cash offer with a purchase price of $11-$12 per share. And Platinum submitted a cash offer with a purchase price of $11-$12 per share. On June 10, 2019, PE Bidder K indicated its initial valuation of the Company at $10.50 per share. Each of these offers were grossly inadequate, as evinced by the prices analysts had just recently indicated they believed would be warranted in a merger based upon their in-depth knowledge of the Company and industry.

69.     Over the course of the next month and half, the various bidders continued their attempts to acquire Wesco at a grossly unfair price. And on July 3, PE Bidder G informed the Financial Advisors that it would most likely not pursue an acquisition.

70.     There was absolutely no need for Wesco to enter into a merger transaction in 2019 or the foreseeable future. This is evinced by the fact that management had a strong stand-alone plan, including the Wesco 2020 initiative, as well as the positive statements regarding the Company's future financial prospects that management made in conjunction with announcing the Company's second quarter and third quarter 2019 financial results.

71.     Nevertheless, once it became obvious to Wesco management and the SAC that bidders were unwilling to budge from their lowball offers, they suddenly decided there was a need to revise the Initial Management Projections that had been approved just three months earlier. Specifically, on July 26, 2019, the SAC requested that the Company's management create new projections, the Updated Management Projections.

72.     On July 28, 2019, Company management and the Financial Advisors held a call with Platinum to discuss valuation, including the financial projections.

73.     On July 31, 2019, Platinum submitted a revised bid $10.42 per share. Additionally, PE Bidder B indicated that it would need additional time to complete due diligence, and it was removed from the sales process.

74.     On August 1, 2019—the afternoon immediately after receiving Platinum's lowered offer and exactly a week before the Merger was approved by the Board—the Financial Advisors reviewed their Preliminary Valuation Analyses with the Board. The Preliminary Valuation Analyses must have been performed using the Initial Management Projections, because the Updated Management Projections were not approved for use by the Financial Advisors until this very same meeting. At that same meeting, Company management also presented the Updated Management Projections, and the Board then authorized the Financial Advisors to use them explicitly in connection with their forthcoming fairness opinions.

75.     In addition to the above facts, the illegitimacy of the Updated Management Projections is further evinced by the fact that only the Initial Management Projections—***not the Updated Management Projections***—were given to potential bidders, including Platinum. Moreover, as set forth herein, the "trends in the industry and markets in which the Company operates and the recent performance of the business" offered on page 72 of the Proxy as justifications for  updating the Initial Management Projections would have either resulted in *increases* to the financial metrics, or preexisted the creation of the Initial Management Projections and thus were already accounted for in the Initial Management Projections.

76.     Over the course of the next week, the SAC and Platinum negotiated over terms of the Merger Agreement and final deal price. On August 5, 2019, Platinum submitted its final offer

of $11.05 per share, and the Board accepted. Meanwhile, the Financial Advisors, using the Updated Management Projections, were re-performing their valuation analyses to arrive at their fairness opinions.

77.    On August 8, 2019, Morgan Stanley reviewed its updated valuation analyses with the Board and gave its fairness opinion presentation. Then, J.P. Morgan reviewed its updated valuation analyses with the Board and gave its fairness opinion presentation. The Board then proceeded to unanimously approve the Merger Agreement.

78.    As a condition of Platinum entering into the Merger Agreement, Carlyle (through its affiliate Falcon Aerospace Holdings, LLC), Makaira Partners, LLC (through certain affiliates), and Randy Snyder and certain affiliated trusts entered into a Voting and Support Agreement. Among other things, the Voting Agreements required the parties to vote all their shares in favor of the Merger, and precluded any of the parties from discussing or encouraging any party to make a superior offer.

79.    On August 9, 2019, Wesco management announced the Company's positive financial results for the third quarter 2019, ending on June 30, 2019. Earnings per share results were in-line with expectations, and reported revenues beat expectation with Net sales of $442.4 million, up 7.8 percent. The Company also reported free cash flow for the quarter of over $47 million. Individual Defendant Renehan stated: "Robust sales growth continued in the fiscal 2019 third quarter, primarily driven by higher sales under long-term contracts for both chemical and hardware products. This growth reflects continued strong performance in the Americas, which is our largest segment, and was achieved despite a decline in our EMEA region. Cash from operating activities increased significantly in the third quarter, primarily due to further improvements in inventory management and our continued focus on working capital….We executed Wesco 2020

footprint optimization initiatives in the third quarter at our most aggressive pace to-date, as we further developed multi-product distribution centers and transferred inventory from older single-product warehouses. As these activities are completed, the associated temporary costs are expected to decline significantly. Based on our continued progress to-date, we remain confident in our ability to achieve our target of at least $30 million in pre-tax run-rate savings from Wesco 2020." As a result of this positive news, Wesco share prices increased 6.7%.

80.     In conjunction with the August 9, 2019 third quarter earnings announcement, management also **reiterated the improved full year 2019 outlook**—reiterating that it continued to expect net sales in fiscal 2019 to increase at a mid-to-high single-digit percentage rate (*i.e.*, **better than the expectation they announced on January 31, 2019 immediately prior to creating the Initial Management Projections**). Management also stated that they continued to expect higher sales volume and Wesco 2020 benefits to drive a high-single-digit percentage increase in adjusted EBITDA in fiscal 2019.

81.     On September 13, 2019, Defendants caused the materially false and misleading Proxy to be filed with the SEC and mailed to the Company's stockholders.

82.     On October 24, 2019, after receiving the materially false and misleading Proxy, a majority of Wesco's stockholders voted to approve the Merger.

83.     The Merger closed on January 9, 2020, and, as a result, Wesco stockholders suffered significant damages in that they received consideration that was far less than the true value of their shares.

## II.     The Materially False and/or Misleading Statements in the Proxy

84.     On August 29, 2019, Defendants caused a preliminary proxy statement to be filed with the SEC in connection with the Merger. And, on September 13, 2019, Defendants caused a

definitive proxy statement to be filed with the SEC and disseminated to Wesco's stockholders to solicit their approval of the Merger.

85.     The Individual Defendants, as directors and officers of the Company, had a duty to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. Furthermore, the Individual Defendants were required to review the Financial Advisors' analyses in connection with their receipt of their fairness opinions, question the Financial Advisors' representatives as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions. However, as set forth herein, the Proxy contained materially false and/or misleading statements, in violation of Sections 14(a) and 20(a) of the Exchange Act. The Defendants were thus negligent in their preparation and review of the Proxy.

86.     As set forth above, the Proxy contained seven categories of materially false and/or misleading statements and/or omissions.

87.     **First**, the Defendants elected to include summaries of the valuation analyses Morgan Stanley and J.P. Morgan (the "Financial Advisors") conducted in conjunction with their fairness opinions on pages 55-71 of the Proxy along with "implied value per share" ranges, even though the Individual Defendants knew or should have known that those valuation analyses and value per share ranges were illegitimate and did not accurately reflect the implied value of the Company's shares and the fairness of the Merger Consideration. Indeed, the Individual Defendants knew that the financial advisors relied solely upon the illegitimate Updated Management Projections to conduct their valuations. The law did not require the Individual Defendants to obtain

fairness opinions, and it certainly did not require them to obtain opinions based upon concocted financial projections that did not reflect Wesco's actual future financial prospects. And Section 14(a) of the Exchange Act and Rule 14a-9 prohibited them from including valuation analyses summaries in the Proxy that were materially misleading, which is precisely what they did.

88.     **Second**, the statement on page 50-51 of the Proxy citing the baseless fairness opinions as "positive factors" that supported the Board's determination to recommend that stockholders adopt the Merger Agreement and as a "reason for the Merger" was materially misleading because,  from this statement, reasonable stockholders would understand that the Board believed that the Financial Advisors accurately analyzed Wesco's potential financial growth and concluded $11.05 to be fair consideration for a Wesco share. These facts that a reasonable investor would have taken from the challenged statement conflict with undisclosed facts or knowledge held by Wesco management concerning the inaccuracy and flaws in the Financial Advisors' analyses. Defendants knew that the Financial Advisors' fairness opinions were prepared by utilizing the illegitimately lowered Updated Management Projections, and that, utilizing the legitimate Initial Management Projections, the implied per share value ranges for Wesco common stock would have significantly exceeded the Merger Consideration, reaching as high as $18.39 per share.

89.     **Third**, the Proxy falsely or misleadingly stated that the significantly lower Updated Management Projections: (i) "were reasonably prepared on bases reflecting the best currently available estimates and judgments of management of the Company at the time prepared of the Company's future financial performance." (Proxy at 56); (ii) "were reasonably prepared based on assumptions reflecting the best currently available estimates and judgments by management as to the expected future results of operations and financial condition of the Company . . . ." (Proxy at

66).[3] Additionally, the Proxy falsely or misleadingly stated that both the Initial Management Projections and the Updated Management Projections reflected variables, assumptions and estimates as to future events "that management believed were reasonable at the respective times the Management Projections were prepared[.]" Proxy at 75. These statements were materially false or misleading because, as set forth below, the Updated Management Projections were ***not*** actually prepared on a reasonable basis, did ***not*** reflect the best estimates and judgments of Wesco's management, and did ***not*** reflect Wesco's expected future financial performance as of the date they were prepared.

90.     ***Fourth***, the statement on page 72 of the Proxy that the "Updated Management Projections represent an update of the Initial Management Projections to take into account trends in the industry and markets in which the Company operates and the recent performance of the business" and the bullets listed thereunder purporting to describe the "trends" that the Updated Management Projections "take into account" were false and/or misleading, because the Updated Management Projections were created solely for the purpose of providing the Financial Advisors with projections they could use to justify the otherwise unfair Merger Consideration. Indeed, the Updated Management Projections served no legitimate business purpose, as they were approved on August 1, 2019, a mere week before the fairness opinions were rendered and by which time the

---

[3]     The Proxy indicated that the Financial Advisors "assumed" that the Updated Management Projections they used in conjunction with their fairness opinions were reasonably prepared on bases reflecting the best currently available estimates and judgments of Company management, after explicitly noting that the Financial Advisors discussed the Company's prospects with its senior executives. The clear take away from these statements is that *Wesco's senior management told* the Financial Advisors (and the Financial Advisors thus assumed) that the Updated Management Projections actually were reasonably prepared on bases reflecting the best currently available estimates and judgments of Company management at the time prepared. This statement was misleading because, as set forth herein, the Updated Management Projections were *not* reasonably prepared on bases reflecting the best currently available estimates and judgments of Company management.

Board had made clear it was committed to finalizing a merger. Furthermore, as set forth in paragraphs 91-96 below, the "trends" the Updated Management Projections were purportedly prepared to represent did not and could not actually justify the reductions to the Initial Management Projections, and such reductions were inconsistent with public statements made my Wesco management regarding the Company's future financial prospects.

91.    Financial results and business performance for the first three quarters of fiscal 2019. As discussed above, the Company announced financial results for each of the first three quarters on January 31, 2019, May 2, 2019, and August 9, 2019. The results of the second and third quarters were positive both from a gross perspective and in light of expectations, so they could not have justified the significant downgrade to the Initial Management Projections. The first quarter results were negative, but were also well-known by management and the Board and accounted for in the Initial Management Projections.

92.    The outlook for the global aerospace and other markets that Wesco Aircraft serves and the increased competitive environment, especially with regards to the global distribution of aerospace parts. The large majority of Wesco's business occurs in the United States. Furthermore, during the relevant time period, the Company did not issue any negative statements about the global aerospace market. The only related statements were either positive and referred to growing opportunity in the marketplace, or assured stockholders that any issue was not systemic to the market, but specific to solvable issues at Wesco. *Supra* ¶ 65. Accordingly, the outlook for the global aerospace and other markets that Wesco serves did not serve as a legitimate reason to downgrade the Initial Management Projections.

93.    The Company's execution of improvements related to its Wesco 2020 initiative, including its progress with respect to cost reduction and its ability to continue improving inventory

management efficiency. Over the course of the first three quarters of 2019, especially the second and third quarters, the Company released positive statements about the Wesco 2020 initiative and management were highly optimistic about its impact going forward. As set forth above, during the second quarter earnings call, management stated: "In addition, our Wesco 2020 initiatives accelerated, and SIOP processes drove more efficient inventory management and increased cash flow." and "We quickened the pace of Wesco 2020 execution, which is driving greater benefits. We continue to expect benefits to increase in the second half of fiscal 2019 and into fiscal 2020 as our execution accelerates. We remain confident in our ability to generate at least $30 million in annualized pretax benefits through Wesco 2020, with full realization still expected during fiscal 2020." And in the third quarter 2019 press release, Individual Defendant Renehan stated: "We executed Wesco 2020 footprint optimization initiatives in the third quarter at our most aggressive pace to-date, as we further developed multi-product distribution centers and transferred inventory from older single-product warehouses. As these activities are completed, the associated temporary costs are expected to decline significantly. Based on our continued progress to-date, we remain confident in our ability to achieve our target of at least $30 million in pre-tax run-rate savings from Wesco 2020." As evinced by management's positive remarks regarding the Wesco 2020 initiative made in conjunction with the second and third quarter 2019 earnings releases, "the Company's execution of improvements related to its Wesco 2020 initiative" could not have served as a legitimate basis for the significant reduction to the Initial Management Projections.

94.     Trends in sales volume and margins for sales of hardware products both on an ad-hoc and contractual basis. Management was positive about hardware sales on both an ad-hoc and contractual basis. During the second quarter earnings call, Individual Defendant Renehan stated: "Our Americas business, which represented 81% of total net sales in the second quarter, continued

to deliver a strong performance. Sales in the Americas were 11% higher, with growth achieved in all major products, especially in chemical revenue and ad-hoc hardware sales….We're also expanding long-term agreements with suppliers to reduce costs of sales further, with greater penetration in hardware and new deals in chemical and electrical products." And CFO Shiba stated: "We continue to benefit from our participation in the Joint Strike Fighter program as well as other strong customer relationships. Sales of contract hardware products increased 4%, primarily due to higher business jet and military demand." And, in the third quarter 2019 earnings announcement, Individual Defendant Renehan stated: "Robust sales growth continued in the fiscal 2019 third quarter, primarily driven by higher sales under long-term contracts for both chemical and hardware products." Thus, trends in hardware sales—both on an ad-hoc and contractual basis—could not have legitimately justified the significant reductions to the Initial Management Projections.

95.     <u>The capture of new business opportunities</u>. Capturing new business would only increase the earnings potential of Wesco. Furthermore, Wesco was performing extremely well at winning new business. As Individual Defendant Renehan stated during the second quarter 2019 earnings call: "**This was one of the strongest quarters for new business that we've seen in more than two years, proof that customers continue to recognize Wesco's enduring value proposition...**We grew the topline at a robust pace, with the strongest results seen in the Americas. We're winning new business and renewing contracts at a solid pace, reflecting Wesco's enduring robust value proposition…Based on the strong sales momentum achieved in the first half of the year, we're now targeting mid- to high single-digit percentage growth in net sales in fiscal 2019. We expect that this growth will continue to be driven by new business and existing contracts as well as higher ad-hoc sales." Accordingly, the trends in Wesco's capturing of new business

opportunities were *positive*, and could not have legitimately justified the significant *reductions* to the Initial Management Projections.

96.     <u>Performance trends of the Company's business in Europe</u> and <u>the impact on overall sales and margins of the increasing proportion of pass-through chemical revenue</u>. Performance issues in Europe and pass-through margin problems were negative factors, but they could not have justified a reduction to the Initial Management Projections because they were well-known prior to the creation of the Initial Management Projections and already accounted for. Indeed, these were the primary issues that caused the significant drop in the Company's stock price during the second-half of 2018, and these issues were discussed publicly by Company management on November 17, 2018 and January 31, 2019. Therefore, these issues also could not justify the significant reductions to the Initial Management Projections.

97.     ***Fifth***, the Updated Management Projections themselves (set forth on page 74 of the Proxy) were materially false or misleading because, as set forth herein, they were not actually prepared on a reasonable basis, did not reflect the best estimates and judgments of Wesco's management, and did not legitimately reflect Wesco's expected future financial performance as of the date they were prepared.

98.     ***Sixth***, the statements indicating that the Board believed that the Merger and Merger Consideration were "fair to and in the best interests of" stockholders (Proxy at cover letter, 7, 21, 31, 49-54) were materially false or misleading. As set forth herein, the Defendants knew that the Merger Consideration undervalued stockholders' shares, and that the Financial Advisors' fairness opinions were predicated on the illegitimately lowered Updated Management Projections that were entirely inconsistent with management's actual expectations about the Company's future

prospects, and that, utilizing the legitimate Initial Management Projections, the implied per share values would have ranged significantly above the Merger Consideration.

99.   **Seventh**, the failure to disclose the Preliminary Valuation Analyses constitutes a material omission in violation of Rule 14a-9. Given that the Updated Management Projections were first approved by the Board at the same August 1, 2019 meeting during which the Financial Advisors presented their Preliminary Valuation Analyses, those analyses must have been predicated on the significantly higher and legitimate Initial Management Projections. Thus, if the Preliminary Valuation Analyses were disclosed, they would have illuminated the unfairness of the Merger Consideration and undercut the positive language in the Proxy touting the fairness of the Merger Consideration. Therefore, by disclosing solely the Financial Advisors' valuation analyses predicated on the Updated Management Projections, and withholding the Preliminary Valuation Analyses, the Proxy misled shareholders as to the value of their Wesco shares and the purported fairness of the Merger Consideration.

100.   **Eighth**, the Proxy omitted material information that was necessary for shareholders to appreciate a significant conflict of interest that impacted the strategic review and negotiation process. Specifically, the Proxy failed to disclose that Individual Defendant Renehan was engaged in discussions to keep his lucrative position as CEO with the combined post-Merger company. The Proxy cryptically stated that on August 1, 2019, "[t]he financial advisors summarized the key financial and other terms of Platinum's bid, which included an all-cash offer at a price of $10.42 per share, along with a request for a five-day exclusivity period, receipt of draft third quarter public earning materials and discussions with Mr. Renehan and key members of the management team[,]" (Proxy at 46) without any explanation as to *what the requested discussion with Mr. Renehan concerned*. And the section of the Proxy purporting to identify the interests in the Merger held by

the Company's officers and directors that were "different from" shareholders' interests (Proxy at 76-83) made no reference to Renehan maintaining his job as CEO of the post-Merger combined company. The Proxy was issued on September 13, 2019, and the shareholder vote was October 24, 2019. It defies credulity to believe that Platinum and Renehan did not discuss his continued employment before the shareholder vote, yet that material fact was hidden from shareholders. This significant conflict of interest aligned Renehan's interests with Platinum rather than the Company's shareholders.

101.    In sum, the Proxy contained materially false or misleading statements, in violation of Section 14(a) and Rule 14a-9. The false and misleading Proxy was an essential link in the consummation of the unfair Merger, as the Merger could not have been consummated without the dissemination of the Proxy.

**III.    The Materially False and Misleading Proxy was an Essential Link in the Consummation of the Merger, Which Caused Plaintiff and the Class Financial Loss, as Their Shares Were Worth More Than the Merger Consideration**

102.    As noted above, the Proxy materially misled Wesco stockholders with respect to the legitimacy of the significantly reduced Updated Management Projections, the value of their shares, and the purported fairness of the Merger Consideration.

103.    The Merger was financially unfair to Wesco's stockholders, and it could not have been consummated without the materially false and misleading Proxy. As a result of the materially misleading Proxy and the Merger that the Proxy was an essential link in consummating, Plaintiff and the Class suffered financial loss, as their shares were worth significantly more than the Merger Consideration. Indeed, the Company's legitimately prepared Initial Management Projections indicated that stockholders' shares were worth up to $18.39, and the prices analysts indicated they

believed would be warranted in a merger based upon their in-depth knowledge of the Company and industry significantly exceed the Merger Consideration and ranged as high as $18.00 per share.

104.     The $11.05 Merger Consideration on the other hand provided virtually no premium to Wesco's rebuilt stock price following the second and third quarter results. In fact, the Merger Consideration represented a ***discount*** to closing price of Wesco's stock on June 13, 2019, June 28, 2019, July 2, 2019, and July 5, 2019.

105.     Furthermore, as of August 7, 2019, analysts issued price targets ranging has high as $13.00.

106.     In sum, the Merger Consideration the Company's stockholders received was unfair and inadequate because the intrinsic value of their shares materially exceeded the Merger Consideration. And, as noted above, the Company had strong stand-alone prospects, and there was absolutely no need for it to enter into a merger.

## IV.     The Conflicted Defendants and Financial Advisors Had Unique Financial Motivations for Supporting the Unfair Merger

107.     Wesco's directors and management faced personal conflicts of interest which may have motivated them to support the unfair Merger.

108.     First, as noted above, pursuant to the Amended and Restated Stockholders Agreement entered into with Carlyle, Carlyle had the right to nominate three of the members of the Wesco board of directors, and Randy Snyder and certain stockholders affiliated with him had the right to nominate one of the members of the Wesco board of directors.

109.     At the time of the Merger, Carlyle owned approximately 23.4% of Wesco's common stock. Makaira Partners, LLC owned approximately 7.0%. Certain trusts affiliated with Randy Snyder owned approximately 10.5%. Uncoincidentally, as a condition to the Merger, these

three stockholders entered into Voting Agreements, and agreed to vote all 41% of their shares in favor of the Merger.

110.    Accordingly, three of the four members of the SAC—the committee directly responsible for orchestrating the sales process and providing advice to the full Board—were tied to investment managers and hedge funds that had interests different from or in addition to Wesco's common stockholders. *See* Leo E. Strine, Jr., *Who Bleeds When the Wolves Bite?: A Flesh-and-Blood Perspective on Hedge Fund Activism and Our Strange Corporate Governance System*, 126 YALE L.J. 1870 (April 2017) (explaining how the investment horizon for "human inventors" often differs from those of hedge funds and private equity managers, and explaining "[a]lthough the hedge fund will argue to other investors that its plans are durably valuable and maximize long-term returns, the hedge fund will itself not stay and reap the long-term gains for its beneficence. Rather, it will exit, take whatever gains have been baked into the stock price, and leave the actual upside and downside of the change it wrought to others.").

111.    This is even more true if there exists a desire for liquidity from an otherwise illiquid block of shares, which both Carlyle and Makaria had.

112.    With respect to Carlyle, its acquisition of Wesco was part of its "Carlyle Partners IV" fund. That fund was launched in 2005 at $7.8 billion, and consisted of investments in 20 different companies, mostly between 2005 and 2007 (the one exception was an investment in ADT CAPS Co., Ltd, which Carlyle made in 2014). As of the Merger, Carlyle had almost completely wound down its Carlyle Partners IV fund, and exited its investment in 19 of the 20 companies it invested in—the only remaining investment it needed to exit was Wesco:[4]

---

[4]     The Carlyle Group, U.S. Buyout, Carlyle Partners IV, https://www.carlyle.com/our-business/corporate-private-equity/us-buyout (last accessed Jan. 9, 2020).

| Carlyle Partners IV | | | |
| --- | --- | --- | --- |
| *"Launched in 2005 at $7.8 billion, this fund conducts leveraged buyout transactions in North America in targeted industries."* | | | |
| **Investment** | **Industry** | **Date Invested** | **Status** |
| ADT CAPS Co., Ltd. | Industrial | May-14 | *Exited* |
| Allison Transmission, Inc. | Transportation | Aug-07 | *Exited* |
| ARINC Incorporated | Aerospace, Defense & Government Services | Oct-07 | *Exited* |
| AxleTech International Holdings, Inc. | Transportation | Oct-05 | *Exited* |
| Dunkin' Brands, Inc. | Consumer & Retail | Mar-06 | *Exited* |
| Hertz Corporation | Transportation | Dec-05 | *Exited* |
| Insight Communications Company, Inc. | Telecom & Media | Dec-05 | *Exited* |
| JMC Steel Group (Formerly John Maneely Company) | Industrial | Mar-06 | *Exited* |
| Kinder Morgan, Inc. | Energy & Power | May-07 | *Exited* |
| LifeCare Holdings, Inc. | Healthcare | Aug-05 | *Exited* |
| MultiPlan, Inc. | Healthcare | Apr-06 | *Exited* |
| Nielsen Company, The | Telecom & Media | May-06 | *Exited* |
| NXP Semiconductor N.V. | Technology & Business Services | Dec-06 | *Exited* |
| Open Solutions, Inc. | Technology & Business Services | Jan-07 | *Exited* |
| Oriental Trading Company, Inc. | Consumer & Retail | Jul-06 | *Exited* |
| Philosophy, Inc. | Consumer & Retail | Mar-07 | *Exited* |
| PQ Corporation | Industrial | Jul-07 | *Exited* |
| SS&C Technologies, Inc. | Technology & Business Services | Nov-05 | *Exited* |
| Veyance Technologies, Inc. | Industrial | Jul-07 | *Exited* |
| ***Wesco Aircraft Holdings, Inc.*** | ***Aerospace, Defense & Government Services*** | ***Sep-06*** | ***Current*** |

113.    Additionally, at the time of the Merger, Carlyle was in the midst of a $100 billion fundraising campaign, which it stated it aimed to meet by the end of 2019. As of February 12, 2019, it still needed to raise $10 billion to meet its goal.

114.    Furthermore, Makaria is a relatively small hedge fund, with 4 clients, 7 employees, and approximately $628 million under management. It first invested in Wesco in the second quarter of 2013, and, based on an analysis of its Form 13F filings, its average holding time for the stocks it invests in is 12 quarters. In other words, Makaria also operates on a short investment horizon. And it recently demonstrated its desire for liquidity when it liquidated nearly two million shares of Wesco at a discounted price, just days before the Company announced the final regulatory approval and ten days prior to the consummation of the Merger. On December 31, 2019, Makaira liquidated 1,956,070 shares of its Wesco common stock when the stock was trading at $11.01 per share—$.04 less per share than the Merger Consideration—resulting in a nearly $80,000 haircut. On January 2, 2020, the U.K. Competition and Markets Authority cleared the Merger resulting in all necessary regulatory approvals required for the Merger. On January 6, 2020, the Company filed a Form 8-K announcing that the Merger was expected to close in three days on January 9, 2020. Apparently, Makaria was so eager for a quick cash infusion that it could not wait the extra 10 days for the deal to close, and willingly sacrificed value for liquidity.

115.    And the fourth member of the SAC, CEO Renehan—along with the other members of the Company's senior management—cashed in on millions of dollars in lucrative golden parachute compensation from the consummation of the Merger that they would not have received if the Company had remained a stand-alone entity, as illustrated by the chart below:

### Golden Parachute Compensation

| Name | Cash(1) | Equity(2) | Benefits & Perquisites(3) | Total |
|---|---|---|---|---|
| Todd Renehan | $ 3,712,500 | $ 3,805,238 | $ 73,803 | $ 7,591,541 |
| Kerry Shiba | $ 2,500,000 | $ 1,563,476 | $ 73,361 | $ 4,136,837 |
| Alex Murray | $ 2,562,500 | $ 2,969,484 | $ 78,663 | $ 5,610,647 |
| Declan Grant | $ 1,536,750 | $ 1,012,620 | $ 76,143 | $ 2,625,513 |
| Dan Snow(4) | $ 0 | $ 0 | $ 0 | $ 0 |

116.    Furthermore, on January 9, 2020 the Company announced that CEO Renehan had officially been named CEO of the combined company. As set forth above, the fact that Renehan

43

was engaged in discussions with Platinum to continue his employment was withheld from shareholders and omitted from the Proxy.

117.    As for the remaining purportedly independent directors, former Delaware Chief Justice Leo E. Strine, Jr. aptly explains their motivation to appease institutional investors:

> Because of the influence of proxy advisors and certain vocal institutional investors, independent directors who wish to remain on the independent director circuit-- which likely comprises almost all of them--are highly sensitive to resisting institutional campaigns at any company on whose board they serve, for fear that they will be targeted for withhold campaigns at all companies with which they are affiliated. That fear is rational because the leading proxy advisory firms look at director performance at other companies when voting at particular companies, and so do the largest investment funds.

Strine, *Wolves*, at 1925-26.

118.    Furthermore, as set forth in the table below, the purportedly independent directors' interests were not truly aligned with shareholders' interests given the size of their stock holdings:

| Name | Company RSUs | Company PSUs(1) | Company Restricted Shares | Company Options (Unvested, In-the-money) | Total Value(2) |
|------|------|------|------|------|------|
| **Executive Officers** | | | | | |
| Todd Renehan | 111,100 | 221,733 | 3,765 | 57,220 | $ 3,805,237.90 |
| Kerry Shiba | 49,634 | 88,216 | 0 | 26,822 | $ 1,563,475.50 |
| Alex Murray | 71,423 | 188,689 | 3,765 | 35,762 | $ 2,969,483.85 |
| Declan Grant | 32,807 | 39,859 | 17,396 | 11,623 | $ 1,012,619.60 |
| Dan Snow(3) | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| **Non-Employee Directors** | | | | | |
| Randy J. Snyder | 0 | 0 | 2,245 | 0 | $   24,807.25 |
| Thomas M. Bancroft III | 0 | 0 | 1,818 | 0 | $   20,088.90 |
| Paul E. Fulchino | 0 | 0 | 3,546 | 0 | $   39,183.30 |
| Jay L. Haberland | 0 | 0 | 1,863 | 0 | $   20,586.15 |
| Scott E. Kuechle | 0 | 0 | 1,908 | 0 | $   21,083.40 |
| Robert D. Paulson | 0 | 0 | 1,852 | 0 | $   20,464.60 |
| Jennifer M. Pollino | 0 | 0 | 1,773 | 0 | $   19,591.65 |
| Norton A. Schwartz | 0 | 0 | 1,751 | 0 | $   19,348.55 |

119.    Moreover, the Financial Advisors also faced significant conflicts of interest, which routinely plague the fairness opinion process. Morgan Stanley had long-standing relationships with Wesco, Carlyle, and Platinum, and it received approximately $100 million in compensation as a result of those relationships during the two years before it rendered its fairness opinion.

Furthermore, $14.5 million of Morgan Stanley's $17.1 million fee (85%) was entirely contingent upon the consummation of the Merger. Additionally, the Proxy failed to disclose the relationship between Morgan Stanley and Carlyle, including that, as of February 11, 2019, Morgan Stanley was a lender under the Amended Restated Credit Agreement with Carlyle and had a $50,000,000 revolving credit commitment.

120.    Similarly, J.P. Morgan also had long-standing relationships with Wesco, Carlyle, and Platinum, and it received tens of millions of dollars in compensation as a result of those relationships during the two years before it rendered its fairness opinion. Furthermore, $6 million of Morgan Stanley's $9 million fee (67%) was entirely contingent upon the consummation of the Merger. Additionally, it was announced in early January 2020 that J.P. Morgan and Morgan Stanley would serve as the two lead book-running managers for Carlyle-backed One Medical's initial public offering.

121.    As a leading scholar on the issue explained in one of the most thorough analyses of the issues that plague the fairness opinion process:

> [C]urrent fairness opinion practice is still deeply flawed. Fairness opinions, and their underlying valuation analyses, are prone to subjectivity and are frequently prepared utilizing methodologies that simply do not jibe with best practices. These defects are exacerbated by the recurring problem of investment banks who are conflicted in their provision of fairness opinions…conflict arises where a bank is asked to opine and advise on a transaction that it stands to benefit from only if the transaction transpires. In fact, under the fee structure explicated above the bank will not be paid if it cannot find fairness. This charge can be made even if the fairness opinion compensation is paid separate from the larger success fee. If the transaction occurs, the remaining overall compensation is significant enough to raise conflict issues.

> This explicit conflict is also accompanied by a more subtle one. The relationships between investment banks and corporate management can run deep, and an investment bank often has business with the corporation and its management that span more than one transaction. In these situations, investment banks may be influenced to find a transaction fair to avoid irritating management and other

corporate actors who stand to benefit from the transaction.  This will ensure future lucrative business.

Steven M. Davidoff, *Fairness Opinions*, 55 AM. U.L. REV. 1557, 1562, 1587 (August 2006).

122.    In sum, the Defendants, other members of Wesco's management team, and the Financial Advisors each faced significant conflicts of interest and had significant personal financial reasons for supporting the Merger despite the inadequacy of the Merger Consideration.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

123.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

124.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

125.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

126.     The omission of information from a Proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

127.     Defendants issued the Proxy with the intention of soliciting stockholder support for the Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which contained multiple materially false and/or misleading statements and omissions, identified above.

128.     Defendants knew or were negligent in not knowing that the Proxy was materially false and misleading. The Individual Defendants were obligated to and undoubtedly did review the Proxy prior to the time it was sent to stockholders. Furthermore, the Individual Defendants were privy to and had knowledge of the both the financial projections for Wesco, the Company's financial results and future financial prospects, and management's statements regarding the Company's future prospects and the truth regarding the Company's future prospects. Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the review of Wesco's financial projections and the Financial Advisors' valuation analyses and fairness opinions.

129.     Furthermore, the Individual Defendants were required to review the Financial Advisors' analyses in connection with their receipt of their fairness opinions, question the Financial Advisors as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions.

130.     Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.

131.     Each Individual Defendant was negligent, as explained below.

132.    Individual Defendant Todd Renehan, as Wesco's CEO, and a director through the entirety of the sales process, knew that the Updated Management Projections were not actually prepared on a reasonable basis, did not reflect the best estimates and judgments of Wesco's management, and did not reflect Wesco's expected future financial performance as of the date they were prepared. Furthermore, as the CEO, Renehan reviewed the Proxy before it was disseminated to the Company's stockholders, and his name appears 18 times in the Proxy, including in several paragraphs describing various actions he took during the sales process. Renehan approved the dissemination of the Proxy, and the use of his name in the Proxy, yet he allowed the Proxy to be disseminated to stockholders with the above-referenced materially false and misleading statements in it.

133.    Individual Defendant Randy J. Snyder was negligent because, as a member of the Board throughout the relevant time period, he was aware of the truth regarding the Company's financial results and expected future financial performance, was aware of the contents of the Initial Management Projections and Updated Management Projections, and reviewed the financial analyses and fairness opinions with the Financial Advisors. Yet he approved the dissemination of the Proxy with the above-referenced materially false and misleading statements in it.

134.    Individual Defendant Dayne A. Baird was negligent because, as a member of the Board throughout the relevant time period, he was aware of the truth regarding the Company's financial results and expected future financial performance, was aware of the contents of the Initial Management Projections and Updated Management Projections, and reviewed the financial analyses and fairness opinions with the Financial Advisors. Yet he approved the dissemination of the Proxy with the above-referenced materially false and misleading statements in it.

135.     Individual Defendant Thomas M. Bancroft III was negligent because, as a member of the Board throughout the relevant time period, he was aware of the truth regarding the Company's financial results and expected future financial performance, was aware of the contents of the Initial Management Projections and Updated Management Projections, and reviewed the financial analyses and fairness opinions with the Financial Advisors. Yet he approved the dissemination of the Proxy with the above-referenced materially false and misleading statements in it.

136.     Individual Defendant Paul E. Fulchino was negligent because, as a member of the Board throughout the relevant time period, he was aware of the truth regarding the Company's financial results and expected future financial performance, was aware of the contents of the Initial Management Projections and Updated Management Projections, and reviewed the financial analyses and fairness opinions with the Financial Advisors. Yet he approved the dissemination of the Proxy with the above-referenced materially false and misleading statements in it.

137.     Individual Defendant Jay L. Haberland was negligent because, as a member of the Board throughout the relevant time period, he was aware of the truth regarding the Company's financial results and expected future financial performance, was aware of the contents of the Initial Management Projections and Updated Management Projections, and reviewed the financial analyses and fairness opinions with the Financial Advisors. Yet he approved the dissemination of the Proxy with the above-referenced materially false and misleading statements in it.

138.     Individual Defendant Scott E. Kuechle was negligent because, as a member of the Board throughout the relevant time period, he was aware of the truth regarding the Company's financial results and expected future financial performance, was aware of the contents of the Initial Management Projections and Updated Management Projections, and reviewed the financial

analyses and fairness opinions with the Financial Advisors. Yet he approved the dissemination of the Proxy with the above-referenced materially false and misleading statements in it.

139.    Individual Adam J. Palmer Stansbury was negligent because, as a member of the Board throughout the relevant time period, he was aware of the truth regarding the Company's financial results and expected future financial performance, was aware of the contents of the Initial Management Projections and Updated Management Projections, and reviewed the financial analyses and fairness opinions with the Financial Advisors. Yet he approved the dissemination of the Proxy with the above-referenced materially false and misleading statements in it.

140.    Individual Defendant Robert D. Paulson was negligent because, as a member of the Board throughout the relevant time period, he was aware of the truth regarding the Company's financial results and expected future financial performance, was aware of the contents of the Initial Management Projections and Updated Management Projections, and reviewed the financial analyses and fairness opinions with the Financial Advisors. Yet he approved the dissemination of the Proxy with the above-referenced materially false and misleading statements in it.

141.    Individual Defendant Jennifer M. Pollino was negligent because, as a member of the Board throughout the relevant time period, she was aware of the truth regarding the Company's financial results and expected future financial performance, was aware of the contents of the Initial Management Projections and Updated Management Projections, and reviewed the financial analyses and fairness opinions with the Financial Advisors. Yet she approved the dissemination of the Proxy with the above-referenced materially false and misleading statements in it.

142.    Individual Defendant Norton A. Schwartz was negligent because, as a member of the Board throughout the relevant time period, he was aware of the truth regarding the Company's financial results and expected future financial performance, was aware of the contents of the Initial

Management Projections and Updated Management Projections, and reviewed the financial analyses and fairness opinions with the Financial Advisors. Yet he approved the dissemination of the Proxy with the above-referenced materially false and misleading statements in it.

143.    Wesco is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

144.    As a direct and proximate result of the dissemination of the misleading Proxy Defendants used to obtain stockholder approval of the Merger, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Merger and the true value of their shares prior to the Merger) in an amount to be determined at trial. By reason of the misconduct detailed herein, Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

145.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

146.    The Individual Defendants acted as controlling persons of Wesco within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Wesco, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete, false, and misleading.

147.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

148.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Merger. They were thus directly involved in preparing this document.

149.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The misleading statements and related projections and information identified above were reviewed by the Board. The Proxy at issue contains the unanimous recommendation of the Board to approve the Merger. The Individual Defendants were thus directly involved in the making of the Proxy.

150.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

151.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

152.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.*, the difference between the value they received as a result of the Merger and the true value of their shares at the time of the Merger) in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Awarding Plaintiff and the Class compensatory and/or rescissory damages sustained as a result of Defendants' wrongdoing, including pre-judgment and post-judgment interest;

C.     Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

D.     Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 10, 2020

**MONTEVERDE & ASSOCIATES PC**

/s/ Juan E. Monteverde
Juan E. Monteverde
Miles D. Schreiner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
       mschreiner@monteverdelaw.com

*Attorneys for Lead Plaintiff and Lead Counsel*
*for the Putative Class*