UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                                          :

JACOB GRAY, individually and on behalf of all others  :
similarly situated,                                    :

                              Plaintiff,     :              19-cv-8528 (LJL)

                                          :

                    -v-                  :      AMENDED OPINION & ORDER

                                        :

WESCO AIRCRAFT HOLDINGS, INC., et al.     :

                                        :

                    Defendants.     :

                                          :
----------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__4/16/2020__

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Jacob Gray brings a putative class action under Section 14(a) of the Exchange

Act of 1934 and Rule 14a-9 promulgated thereunder against Defendants Wesco Aircraft

Holdings, Inc. ("Wesco" or the "Company"), its former Chairman Randy J. Snyder ("Snyder"),

former Chief Executive Officer Todd Renehan ("Renehan"), and former directors, Dayne A.

Baird ("Baird"), Thomas M. Bancroft III ("Bancroft"), Paul E. Fuluchino ("Fulchino"), Jay L.

Haberland ("Haberland"), Scott E. Kuechle ("Kuechle"), Adam J. Palmer ("Palmer"), Robert D.

Paulson ("Paulson"), Jennifer M. Pollino ("Pollino"), and Norton A. Schwartz ("Schwartz").

Plaintiff filed the operative complaint, the Second Amended Complaint, on January 10, 2020.

Dkt. No. 22 ("Second Amended Complaint" or "2d Am. Compl.").

      Defendants move, pursuant to Fed. R. Civ. P. 12(b), for an order dismissing the Second

Amended Complaint with prejudice.  Plaintiff moves, pursuant to this Court's inherent powers,

for an order striking exhibits A, B, C, D, E, and F from Defendants' motion to dismiss.[1]   For the reasons stated, the Court GRANTS the motion to dismiss without prejudice, and GRANTS IN PART AND DENIES IN PART the motion to strike.

## BACKGROUND

The following facts are set forth in the Second Amended Complaint, Dkt. No. 25 ("2d Am. Compl." or "Complaint") and Wesco's September 13, 2019 Definitive Proxy Statement, Dkt. No. 66, Ex. A ("Proxy" or "Proxy Statement"), the facts of which are assumed to be true for purposes of this motion.

**A.     The Platinum Merger**

This case arises out of the August 2019 agreement of Wesco to be acquired by Platinum Equity Advisors, LLC and its affiliates ("Platinum") and the September 13, 2019 definitive proxy statement soliciting votes in favor of the merger.

Wesco, founded in 1953, is a distributor and provider of supply chain management services to the global aerospace industry.  2d Am. Compl. ¶ 43.  The Company's products include Hardware, Chemicals, Electronic Components, Bearings and Other Products, while its services include Quality Assurance, Kitting and JIT Supply Chain Management.  Wesco caters to commercial, military and general aviation sectors, including the original equipment manufacturers and their subcontractors, and also sells products to airline-affiliated and independent maintenance, repair and overhaul providers.

---

[1] In its motion to strike, Plaintiff also asked for the Court to decline to accept as true all of the factual assertions that appear in the Proxy as defined herein but do not appear in the Complaint, but at oral argument agreed that the statements in the Proxy were accurate.  The Court deems that portion of the motion withdrawn.  In any event, it is meritless.

Individual defendant Snyder was Chairman of the Board of Wesco and Renehan was its Chief Executive Officer.  Both were also directors.  Baird, Bancroft, Fulchino, Haberland, Kuechle, Palmer, Paulson, Pollino, and Schwartz are all sued in their capacity as directors.

In November 2018, in the wake of a decline in Wesco's sales margins and a coincident drop in its stock price, the Company began a process to sell itself and Wesco's board engaged a financial advisor.  At the time, the "Carlyle Group" ("Carlyle"), a large private equity firm, owned a significant portion of Wesco's shares; it had acquired a majority ownership position in the Company in July 2006 prior to Wesco's 2011 initial public offering and still held a 23.4% position at the time of the Merger.  *Id.* ¶¶ 44-45.  Wesco had received offers to purchase the Company for a sale price of $14 to $15 from one private equity buyer, *id*. ¶ 49, and had held a meeting with Platinum to discuss a combination of the two entities.  *Id*. at 53.

On January 9, 2019, Wesco's Board established an ad hoc special committee (the "Strategic Alternatives Committee" or "SAC") to oversee and administer the sales process and hired two banks, Morgan Stanley & Co. LLP ("Morgan Stanley) and J.P. Morgan Securities LLC ("J.P. Morgan") (collectively, the "Financial Advisors"), to act as financial advisors with respect to the sale of the Company.  *Id*. ¶ 57.  Individual defendants Baird, Bancroft, Palmer, and Renehan were the members of the SAC.  *Id*.

The sales process lasted from April 2019 until approximately August 5, 2019.  *Id*. ¶¶ 64, 76.  In connection with the sales process, at a meeting on April 8, 2019, the Board authorized management to share with potential bidders a set of projections (the "Initial Management Projections" or "Initial Projections") that it had directed management to prepare as early as February 5, 2019, and which, even as of April 2019, the Board believed could be "subject to scrutiny" based on projection assumptions regarding growth, margins, and turnover rate.  Proxy

40-41.  Plaintiff's case centers on these projections and a later set of projections that management prepared and the Board approved in August 2019 toward the end of the sales process ("Updated Management Projections" or "Updated Projections").

Wesco's bankers initially cast a wide net in attempting to find a buyer for an all-cash transaction.  Between April and May 2019, the Company entered into confidentiality agreements with 14 potential bidders.  2d Am. Compl. ¶ 64; Proxy 41.  The cast of potential acquirors, however, rapidly narrowed.  By June 2019, only four potential bidders remained.  One of these was Platinum.  The others are referred to in the SAC and in the Proxy as PE Bidder K, PE Bidder G, and PE Bidder B.  PE Bidder K indicated its initial valuation of the Company at $10.50 per share, but never submitted a bid.  2d Am. Compl. ¶ 68; Proxy 44.  PE Bidder G submitted a cash offer with a purchase price of $12 per share but by July 3, 2019, it informed the Financial Advisors that it would most likely not pursue an acquisition.  2d Am. Compl. ¶ 69; Proxy 43-44.  That left essentially two bidders, Platinum and PE Bidder B, both of whom in June 2019 submitted cash offers with a purchase price of $11-12 per share, both subject to completing due diligence.  Proxy 43, 45.

The deal between Wesco and Platinum solidified in late July-early August while the parties were conducting due diligence.  Proxy 46.  On July 28, 2019, Wesco management and the Financial Advisors held a call with Platinum to discuss valuation.  2d Am. Compl. ¶ 72; Proxy 45.  A few days later, on July 31, 2019, PE Bidder B indicated that it would need additional time to complete due diligence and was removed from the sales process.  2d Am. Compl. ¶¶ 72-73; Proxy 46.  For its part, Platinum, after "extensive due diligence," had "expressed concerns related to the Company's margins and inventory valuation reserves and fluctuations and the impact of these factors on the business."  Proxy 45.  On the July 28 call with the Company,

Platinum said that it had "additional diligence concerns and questions . . . including regarding the Company's financial performance for the first nine months of fiscal 2019, particularly as relates to future financial projections, sales margins and trends, fixed versus variable cost behavior and certain tax matters." Proxy 45-46.  Nonetheless, on July 31, 2019, despite its concerns, Platinum submitted a revised bid of $10.42 per share.  *Id.* ¶ 73; Proxy 46.

Over the course of the next week, the SAC negotiated with Platinum to improve the terms of its offer.  *Id.* ¶ 76; Proxy 46-47.[2]  On August 5, 2019, Platinum submitted its final offer of $11.05 per share, which the Board accepted.  *Id.* ¶ 76; Proxy 47-48.  On August 9, 2019, Wesco announced that it had entered into a definitive merger agreement (the "Merger Agreement") to be acquired by an affiliate of Platinum in an all-cash transaction ("the Merger").  2d Am. Compl. ¶ 76; Proxy 49.  Under the terms of the Merger Agreement, Wesco shareholders would receive $11.05 in cash for each share of Wesco they held (the "Merger Consideration").  The press release announcing the transaction indicated that the cash purchase price represented a premium of approximately 27.5 percent to the 90-day volume weighted average share price for the period ended May 24, 2019, which, the press release stated, was the last trading day prior to media speculation regarding a potential transaction involving Wesco.  *Id.*

On August 29, 2019, pursuant to the Merger Agreement, Wesco filed a preliminary proxy statement on Schedule 14A.  That proxy statement contained the opinions of the Financial

---

[2] The Proxy reflects that on August 2, 2019, Wesco countered Platinum's offer with a $12.00 per-share price.  On August 3, 2019, Platinum responded, offering a per-share price of $10.77. The next day, Wesco countered again with a $11.63 per-share price, which "represent[ed] an implied premium of 20% over the closing share price of Wesco Aircraft's common stock on May 24, 2019, the last trading day before the Reuters Report that the Company was exploring strategic alternatives, including a potential sale transaction . . . ."  Proxy 47.  On August 5, 2020, Platinum submitted its "final proposal" of $11.05 per-share.  *Id.*

Advisors that the proposed consideration was fair from a financial point of view and the

recommendation of the Board that the shareholders vote in favor of the Merger.  Proxy 55, 64.

On October 24, 2019, a majority of Wesco's stockholders voted to approve the Merger

and, on January 9, 2020, the Merger closed.

**B.     Wesco's Reported Results From May 2018 to The Signing of The Merger Agreement**

The Merger occurred against the backdrop of Wesco's declining performance.  Both

parties devote extensive attention to Wesco's reported financial results, particularly in the second

and third quarters of 2019, and so the Court will describe those results in some detail.  *See* Def.

Br. at 5-8; Op. Br. at 2-3.

In May 2018, the Company announced the launch of its Wesco 2020 initiative, which

was designed to broaden and institutionalize improvements already made to its business during

fiscal 2018 and to improve the Company's performance and profitability.  2d Am. Compl. ¶ 48.

That announcement did not improve Wesco's stock price.  Between August 2018 and April

2019, Wesco's stock price dropped from $13.95 to approximately $8.25.  *Id.* ¶ 50.

On August 16, 2018, Wesco's shares fell approximately 7% as UBS analyst Myles

Walton issued a "sell" rating.  Walton noted that since its IPO in July 2011, Wesco's margins

had collapsed from 20% to a low of 6%.  *Id.* ¶ 51.

On November 16, 2018, the Company announced its fourth quarter and full year 2018

financial results.  The Company's share price fell 8.1% more than any full-day drop since August

2017, as it reported lower earnings than estimated.  *Id.* ¶ 55.

That same day, in its Form 10-K Annual Report filed with the SEC, Wesco also noted

performance in the Europe, the Middle East, and Asia ("EMEA") business segment.  Net sales

for the EMEA segment increased only $4.0 million or 1.6%.  At the same time, income from

operations for the EMEA segment declined $7.2 million or 28.7% as a result of a decrease in gross profit and an increase in expenses and income from operations as a percentage of net sales, which declined from 9.7% for the prior year to 6.8% for the current year ended September 30, 2018.  Average gross margins decreased 4.1 percentage points.  *Id.* ¶ 56.

As previously noted, on January 9, 2019, the Board engaged the Financial Advisors to help sell the Company.  Later that same month, on January 31, 2019, Wesco management announced the Company's negative financial results for the first quarter of 2019.  Although sales for the first quarter grew by about 9% year over year (faster than expected), the *cost* of these sales increased more than 10% and Selling, General and Administrative ("SG&A") expenses also grew faster than sales.  Consequently, pre-tax income at Wesco declined more than 10% to just $22.11 million.  With the news, Wesco share prices dropped 12.7%.  *Id.* ¶ 59.

The Company's financial results for the second and third quarters of 2019, reported during the sales process, followed similar patterns to the preceding quarters—increasing sales and decreasing margins.  The Company's second quarter results were publicly released on May 2, 2019.  The results were generally positive.  *Id.* ¶ 65.  The Company reported free cash flow of $20 million for the second quarter of 2019 and increased guidance from mid-single digit growth to mid to high single-digit percentage growth in net sales in fiscal 2019.  Adjusted EBITDA increased year-over-year primarily due to continued improvement in the Americas but gross profit increased by only $3 million year-over year as the higher sales volume was partially offset by a 160-basis point decline in gross margins, due primarily to a decline in the EMEA region. During the second quarter earnings call, Wesco management said that Wesco had been winning contract renewals by accepting lower margins.  2d Am. Compl. ¶ 65.  As Defendants point out, Def. Br. 5, the Company reported operating income that was significantly down year-over-year

at $29.8 million compared to $33.2 million in the same quarter the prior year." Dkt. No. 26, Ex B at 5.[3] Wesco stock increased over 25% in the wake of the second quarter earnings, from $8.38 to $10.53 per share. 2d Am. Compl. ¶ 66.

On August 9, 2019, the Company announced its financial results for the third quarter of 2019, ending on June 30, 2019. *Id.* ¶ 79. Those are the same results that were the subject of due diligence on the eve of the merger announcement. Wesco reported earnings per share in line with analyst expectations and reported revenues that beat expectations as well as free cash flow for the quarter of over $47 million. However, although gross profits were up slightly year-over-year, they were down compared to the prior quarter. Dkt. No. 26, Ex. C at 27. Gross margin declined by 1.6 percentage points from the second quarter to 23.9%, and fell to 24.8% for the first nine months of 2019. The Company also reported a decline in operating income. *Id.* at 27.

As indicated above, Plaintiff's complaint centers upon two sets of projections that management prepared as the Company was reporting these results and as the Board was engaged in the sales process. In February 2019, Wesco management prepared a set of Initial Management Projections that were approved by the Board for use with bidders on April 8, 2019—*viz* before the end of Wesco's second quarter. 2d Am. Compl. ¶ 5. Those projections showed steadily increasing gross profit and operating income for each year from 2019 to 2023 leading to projected operating income of $238 million in 2023 and projected net income of $151 million in 2023. *Id.*

---

[3] Plaintiff moves to strike Exhibit B on the theory that although the Complaint references the second quarter earning conference call, it does not specially reference or quote the second quarter earnings release. As discussed further below, *see infra* pp. 19-22, the Court takes notice of Wesco's May 2, 2019 Form 8-K as it is incorporated by reference.

On July 26, 2019, after the end of Wesco's second and third quarters of 2019 and as Platinum raised concerns about the Company's margins and inventory valuation reserves and fluctuations, Proxy 45, and as the other potential acquirers dropped out of the bidding, the SAC requested that Company management prepare a second set of projections, the Updated Management Projections.[4]  On August 1, 2020, the Board authorized the use of the Updated Management Projections by the Company's Financial Advisors in connection with their financial analyses and fairness opinions.  2d Am. Compl. ¶ 74.  Negotiations between Wesco and Platinum continued, and on August 4, 2019, Platinum noted that the third quarter results "were lower than projected and that the increasing margin pressures on the business outweighed the benefits of the anticipated synergies of the Company and Platinum's Pattonair business."  Proxy 47.

The Updated Management Projections reduced the Initial Management Projections for nearly every financial metric, including free cash flow, in every single year of the five-year forecast period and, in particular, decreased projected EBITDA for 2023 from $271 million to $224 million, projected discounted cash flow for 2023 from $111 million to $90 million, projected gross profit for 2023 to $508 million and projected operating income for 2023 to $191 million:

---

[4] On July 28, in a call between the Company and Platinum, Platinum had "additional diligence concerns and questions . . . including regarding the Company's financial performance for the first nine months of fiscal 2019, particularly as relates to future financial projections, sales margins and trends, fixed versus variable cost behavior and certain tax matters."  Proxy 45-46.

| | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| **Total Revenue** | | *(in millions)* | | | |
| Initial Management Projections | 1,672 | 1,814 | 1,980 | 2,116 | 2,242 |
| Updated Management Projections | 1,672 | 1,761 | 1,852 | 1,943 | 2,038 |
| *% Change* | 0.00% | -2.92% | -6.46% | -8.18% | -9.10% |
| **Total Gross Profit** | | | | | |
| Initial Management Projections | 420 | 463 | 507 | 537 | 566 |
| Updated Management Projections | 418 | 434 | 457 | 485 | 508 |
| *% Change* | -0.48% | -6.26% | -9.86% | -9.68% | -10.25% |
| **Operating Income** | | | | | |
| Initial Management Projections | 120 | 177 | 213 | 226 | 238 |
| Updated Management Projections | 102 | 150 | 170 | 183 | 191 |
| *% Change* | -15.00% | -15.25% | -20.19% | -19.03% | -19.75% |
| **Net Income** | | | | | |
| Initial Management Projections | 46 | 90 | 123 | 139 | 151 |
| Updated Management Projections | 42 | 70 | 90 | 106 | 114 |
| *% Change* | -8.70% | -22.22% | -26.83% | -23.74% | -24.50% |
| **Adjusted Net Income** | | | | | |
| Initial Management Projections | 83 | 108 | 135 | 150 | 162 |
| Updated Management Projections | 95 | 88 | 102 | 117 | 126 |
| *% Change* | 14.46% | -18.52% | -24.44% | -22.00% | -22.22% |
| **Adjusted EBITDA** | | | | | |
| Initial Management Projections | 175 | 213 | 245 | 259 | 271 |
| Updated Management Projections | 174 | 187 | 203 | 216 | 224 |
| *% Change* | -0.57% | -12.21% | -17.14% | -16.60% | -17.34% |
| **Free Cash Flow** | | | | | |
| Initial Management Projections | 76 | 115 | 134 | 104 | 111 |
| Updated Management Projections | 69 | 55 | 89 | 87 | 90 |
| *% Change* | -9.21% | -52.17% | -33.58% | -16.35% | -18.92% |

2d Am. Compl. ¶ 5.

## C.    The Challenged Statements

On September 13, 2019, Wesco issued its Proxy on SEC Schedule 14A to solicit shareholder votes in favor of the Merger.

Plaintiff alleges that Wesco's Board knowingly agreed to an unfair merger and made materially false and misleading statements in the Proxy to convince stockholders to vote in its favor.  2d Am. Compl. ¶ 3.  In particular, Plaintiff alleges that the reduction made by management to the Initial Management Projections "was not driven by any negative change to Wesco's future financial prospects" and that "the Updated Management Projections were illegitimate and did not reflect the expected future financial performance of Wesco," thus misleading Wesco's stockholders with respect to the purported fairness of the Merger Consideration.  *Id*. ¶¶ 6-7.  According to Plaintiff, had the Financial Advisors utilized the Initial

Management Projections, the implied value per share range calculated in connection with the discounted cash flow analyses would have exceeded the $11.05 per share Merger Consideration, thus demonstrating that the transaction was not fair.  *Id.* ¶ 17.

Plaintiff challenges four sets of statements in the Proxy.  The first three (together, the "Management Projection Statements") relate to the disclosure and preparation of the Updated Management Projections, the description in the Proxy of the fairness opinion prepared by the Financial Advisors which was based in part on the Updated Management Projections, and the description of the Reasons for the Merger which describe the Board's consideration of the opinions of the Financial Advisors that were formulated after consideration of the Updated Management Projections.

As to these three sets of statements, Plaintiff's logic appears to run as follows: (1) the circumstances under which the Updated Management Projections were prepared and the relationship of those projections to the Initial Management Projections render them "illegitimate," *id.* ¶¶ 7, 12, 90; (2) the Proxy's statements of the fairness opinions—which opinions included valuation analyses based in part on the Updated Management Projections—were therefore misleading, *id.* ¶¶ 9, 87; and (3) as a consequence of (1) and (2) above, the Proxy's discussion of the Reason for the Merger, which referred to the fairness opinions, were misleading, as were statements to the effect that Wesco management believed the Updated Management Projections and their underlying assumptions were reasonable, as were statements to the effect that the Board determined that the merger was "fair to and in the best interests of" the Company and stockholders, *id.* ¶¶ 10, 11, 14, 88, 98.  (4) Fourth and finally, Plaintiff also claims that the Proxy omits that Renehan, as Wesco CEO, discussed with Platinum his future

employment as CEO of the combined entity prior to the signing of the Merger Agreement. *Id*.

¶ 16.  An elaboration of challenged Management Projection Statements is set forth below:

1.    <u>The Updated Management Projections ("Statement 1"):</u>  In a section of the Proxy

headed "Certain Management Projections," the Proxy contains tables that summarize separately

each of the Initial Management Projections and the Updated Management Projections, setting

forth projected total revenue, total gross profit, operating income, net income, adjusted net

income, adjusted EBITDA, and free cash flow for 2019 (which is an estimate) and the years

2020, 2021, 2022 and 2023 (which are reflected by the use of the capital letter "P" to be a

projection).

The section containing Initial Management Projections and the Updated Management

Projections is preceded by extensive disclosure regarding the timing and context of the two sets

of projections and how they were used, as well as the basis for the projections and their

reliability (or lack thereof).  Specifically, it states:

> Wesco Aircraft does not, as a matter of course, publicly disclose internal projections of its future financial performance, revenues, earnings, adjusted EBITDA, financial condition or other results due to, among other reasons, the uncertainty of the underlying assumptions and estimates, although Wesco Aircraft has in the past provided investors with full-year financial guidance that may cover areas such as net sales and adjusted EBITDA, among other items, which it has updated from time to time during the relevant year. In connection with Wesco Aircraft's strategic alternatives review process, however, Wesco Aircraft's management prepared certain non-public, unaudited, stand-alone five-year financial projections for the Company over the course of February and March 2019 which were reviewed with the Board in April 2019 and subsequently finalized with the Strategic Alternatives Committee, and then provided to Parent and other potential bidders in connection with their respective due diligence reviews of Wesco Aircraft. We refer to the non-public, unaudited, stand-alone five-year financial projections for the Company that were distributed to Parent and other potential bidders as the "*Initial Management Projections*." In July 2019, at the request of the Strategic Alternative Committee, management prepared revised non-public, unaudited, stand-alone five-year financial projections for the Company (the "*Updated Management Projections*" and together with the Initial Management Projections, the "*Management Projections*"). The Updated Management

Projections represent an update of the Initial Management Projections to take into account trends in the industry and markets in which the Company operates and the recent performance of the business, including, among other things:

> • financial results and business performance for the first three quarters of fiscal 2019;

> • the outlook for the global aerospace and other markets that Wesco Aircraft serves and the increased competitive environment, especially with regards to the global distribution of aerospace parts;

> • the Company's execution of improvements related to its Wesco 2020 initiative, including its progress with respect to cost reduction and its ability to continue improving inventory management efficiency;

> • trends in sales volume and margins for sales of hardware products both on an ad-hoc and contractual basis;

> • the capture of new business opportunities;

> • performance trends of the Company's business in Europe; and

> • the impact on overall sales and margins of the increasing proportion of pass-through chemical revenue.

The Board reviewed the Management Projections at its meeting held on August 1, 2019. After discussions with management and its advisors, the Board authorized Wesco Aircraft's financial advisors to use the Updated Management Projections for purposes of their respective financial analyses and fairness opinions summarized under "*—Fairness Opinion of Morgan Stanley & Co. LLC*" on page 55 of this proxy statement and "*—Fairness Opinion of J.P. Morgan Securities LLC*" on page 64 of this proxy statement. The inclusion of this information should not be regarded as an indication that Wesco Aircraft or its financial advisors or any of their respective representatives or any other recipient of this information considered, or now considers, the Management Projections to be necessarily predictive of future results.

Proxy 71-72.

2.    <u>Description of the Fairness Opinion ("Statement 2")</u>:  The Proxy contains

disclosures regarding how the management projections were used by the Financial Advisors in

connection with the Merger.  In a section entitled Fairness Opinion of Morgan Stanley & Co.,

LLC, the Proxy reports that Morgan Stanley rendered an opinion that the consideration to be

received by the holders of Wesco common stock (other than the holders of the Excluded Shares) pursuant to the Merger Agreement was fair from a financial point of view to such holders of Wesco common stock.

The Proxy recites that in rendering this opinion, Morgan Stanley, among other things, reviewed the Updated Management Projections.  It also reflects that Morgan Stanley had discussions with Company management as well as with Platinum, and reviewed other information including publicly available and internal financial statements, the terms of the Merger Agreement, and the financial performance, prices, and trading activity of other publicly traded companies comparable to Wesco.  The Proxy states that Morgan Stanley assumed that the Updated Management Projections "were reasonably prepared on bases reflecting the best currently available estimates and judgments of management of the Company at the time prepared of the Company's future financial performance."  Proxy 56.

Likewise, with respect to the comparable fairness opinion prepared by J.P. Morgan, the Proxy states J.P. Morgan considered a number of factors including "certain internal financial analyses and forecasts prepared by the management of the Company relating to its business, including the Updated Management Projections."  As with Morgan Stanley, J.P. Morgan assumed that the "financial analyses and forecasts . . . were reasonably prepared based on assumptions reflecting the best currently available estimates and judgments by management as to the expected future results of operations and financial condition of the Company" and expressed no independent view as to such analyses or forecasts.  *Id.* at 66.

The Proxy summarizes the analyses prepared by each of Morgan Stanley and J.P. Morgan.  Those analyses are based, in part, on the Updated Management Projections.

3.  Reasons for the Merger and reasonability of Updated Management Projections

("Statement 3"):  The Proxy states how the Board decided to recommend the Merger to Wesco's

shareholders, including the role of the fairness opinions of the Financial Advisors which relied,

in turn, on the Updated Management Projections.  The Proxy states:

> The Board, after consulting with its financial advisors and outside legal counsel and carefully reviewing and considering various factors described in "Reasons for the Merger" – unanimously (i) determined that the Merger Agreement and the transactions contemplated thereby, including the Merger, are advisable, fair to and in the best interests of Wesco Aircraft and its stockholders, (ii) approved and declared advisable the Merger Agreement and the execution, delivery and performance of the Merger Agreement and the consummation of the transactions contemplated thereby, including the Merger; (iii) directed that the Merger Agreement be submitted to the stockholders of Wesco Aircraft for their adoption at the special meeting and (iv) recommended that Wesco Aircraft's stockholders adopt the Merger Agreement.

Proxy 50.

> In a section labelled Reasons for the Merger, the Proxy states:

> In evaluating the Merger Agreement and the Merger, the Board consulted with Wesco Aircraft's executive management regarding the business, financial condition and future prospects of Wesco Aircraft, trends in Wesco Aircraft's industry and the terms and conditions of the Merger. In addition, the Board consulted with Wesco Aircraft's outside legal counsel, Latham, regarding the terms and conditions of the Merger Agreement and the fiduciary duties and responsibilities of the members of the Board in their consideration of the Merger, and Wesco Aircraft's financial advisors, Morgan Stanley and J.P. Morgan, regarding certain financial analyses with respect to Wesco Aircraft and the fairness from a financial point of view to Wesco Aircraft's stockholders of the consideration to be paid to the holders of Wesco Aircraft common stock in the Merger (other than the holders of Excluded Shares).

*Id.*

The Proxy then lists a number of "positive factors" it considered in recommending the

merger, including fairness opinions of the two Financial Advisors.  *Id.* at 51.  In addition, the

Proxy states that the board "believed [that the assumptions and variables underlying the Updated

Management Projections] were reasonable" at the time they were prepared.  *Id.* at 75.

15

4.      Discussions between Wesco CEO and Platinum ("Statement 4"):  In the description of the Wesco Board meeting of August 1, 2019, the Proxy states in part: "The financial advisors summarized the key financial and other terms of Platinum's bid, which included an all-cash offer at a price of $10.42 per share, along with a request for a five-day exclusivity period, receipt of draft third quarter public earning materials and *discussion with Mr. Renehan and key members of the management team*."  Proxy at 46 (emphasis added).  The discussion of the August 1, 2019 board meeting concludes with the report: "After discussion, the Board instructed the Strategic Alternatives Committee to continue to work with the Company's management and advisors to negotiate with Platinum and any other bidders that may emerge and come back to the Board after those discussions.  *It was determined that the Company would not enter into any exclusivity agreement with Platinum nor would it allow for discussions between representatives of Platinum and management with respect to any employment, compensation, equity investment or similar matter at that time.*"  *Id.* (emphasis added).

Crediting the first portion of the Proxy discussion—that Platinum asked to speak to Renehan—but discounting the report of the response that the SAC would not permit such discussion, Plaintiff alleges "[i]t defies credulity to believe that Platinum and Renehan did not discuss his continued employment before the stockholder vote."  2d Am. Compl. ¶¶ 16, 100.  Plaintiff notes that after the transaction closed on January 9, 2020, Renehan remained as CEO of the combined company.  *Id*. ¶ 46.

## PROCEDURAL HISTORY

This matter was initiated by the filing of a complaint by alleged shareholder and putative class representative Jacob Gray, on September 13, 2019, Dkt. No. 1.  On January 6, 2020, pursuant to the Private Securities Litigation Reform Act ("PSLRA"), this Court appointed Jacob Gray as lead plaintiff and Monteverde & Associates PC as lead counsel.  The First Amended

Complaint was filed on October 7, 2019, Dkt. No. 6, and the Second Amended Complaint (the operative complaint) was filed on January 10, 2020, Dkt. No. 22.  Defendants filed the Motion to Dismiss currently before the Court on January 24, 2020, Dkt. Nos. 24, 25; Plaintiffs' opposition was filed on February 7, 2020, Dkt. No. 27; and Defendants' reply was filed on February 24, 2020, Dkt. No. 35.  Also before the Court is a motion to strike exhibits to the Motion to Dismiss, filed on February 7, 2020, Dkt. No. 28, which the Court takes up below.

**STANDARD OF REVIEW**

**A.      Standards of Review under 12(b)(6) and the PSLRA**

On a 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir. 2002), *cert. denied*, 537 U.S. 1089 (2002).  This requirement "is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

A complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).  The ultimate question is whether "[a] claim has facial plausibility, [i.e.] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery

will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx v. Siracusano*, 563 U.S. 27, 46 (2011).

The PSLRA imposes additional requirements on a plaintiff bringing a private securities fraud action.  Plaintiff must "specify each statement alleged to have been misleading" in the Proxy and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1). Plaintiff cannot plead "the materiality of the alleged misstatements or omissions . . . in a conclusory or general fashion."  *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 626 (S.D.N.Y. 2005) (citation omitted); *see In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 367 (E.D.N.Y. 2013) ("The materiality of allegedly false financials may not be pled in a conclusory or general fashion.").  "[P]laintiffs 'must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so.'"  *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 564 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) (citation omitted).

In addition, where scienter is at issue, as under the "actual knowledge" prong of the safe harbor for forward-looking statements, *see Slayton v. American Express*, 604 F.3d 758, 766 (2d Cir. 2010), the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind."  15 U.S.C. § 78u-4(b)(2).  Under this heightened pleading standard for scienter, a "complaint will survive . . .  only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation, but the facts alleged must be "taken collectively."  *Id.* at 323.  Furthermore, because the safe harbor specifies an "actual knowledge"

standard for forward-looking statements, "the scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." *Slayton*, 604 F.3d at 773 (citing *Inst. Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009)).

**B.      Judicial Notice and Incorporation by Reference**

Plaintiff moves to strike Exhibits A-F of the declaration attached to the motion to dismiss on the grounds that they were not incorporated into the Complaint by reference and should not be judicially noticed.  These exhibits include the Definitive Proxy Statement (Ex. A); Form 8-K filed on May 2, 2019 along with a Press Release and Investor Presentation (Ex. B); Form 10-Q filed on August 8, 2019 (Ex. C); Wesco's press release announcing the merger (Ex. D); Form 8-K filed November 25, 2019 along with a press release (Ex. E); and Form 10-K filed November 26, 2019 (Ex. F).

Two separate rules permit the Court to consider documents that are not contained within the four corners of the complaint.  *See Tellabs*, 551 U.S. at 322-23 (on a motion to dismiss, "courts ordinarily examine . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

First, under Federal Rule of Evidence Rule 201, the Court may take judicial notice of a fact that is "not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.  Under that rule, in federal securities fraud cases, courts can consider "public disclosure documents required by law to be filed, and actually filed, with the SEC."  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).  Moreover, contrary to Plaintiff's argument here, under this doctrine, the court need not

limit itself to "documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Id.* at 773.

Thus, as long ago as 1991, in *Kramer*, the Second Circuit held that it was proper, in a case where the plaintiff alleged misrepresentations in an offer to purchase, for the court to take judicial notice of related documents, such as the joint proxy statement that placed statements in the offer to purchase in context. The court reasoned, in part: "Were courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed even though they would be doomed to failure. Foreclosing resort to such documents might lead to complaints filed solely to extract nuisance settlements." *Id.* at 774. *Kramer* remains good law today. *See, e.g., Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019) (on motion to dismiss, court may consider "public disclosure documents filed with the SEC"); *Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (court may take judicial notice of regulatory filings); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("[W]here public records that are integral to a fraud complaint are not attached to it, the court, in considering a Rule 12(b)(6) motion, is permitted to take judicial notice of those records.").

Second, relying on Federal Rule of Civil Procedure Rule 10(c), the Second Circuit has long held that a complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference," and that a court may consider documents incorporated in a complaint by reference on a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) without converting it to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. *Cortec Indus Inv. v. Sum Holdings,* 949 F.2d 42, 47 (2d Cir. 1991); *see Nicosia v. Amazon.con, Inc.*, 834 F.3d 220, 230-31 (2d Cir. 2016)

("[S]tatements or documents incorporated in [the complaint] by reference" properly considered on motion to dismiss).  Those same principles permit the court to consider on a 12(b)(6) motion to dismiss documents upon which the plaintiff relies in bringing suit, which are integral to the complaint, and as to which they had notice.  *Cortec*, 949 F.2d at 48.  Generally, for this rule to apply, the plaintiff must have relied on the document in drafting the complaint; notice and possession are not enough.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

Thus, combining both doctrines, "the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken."  *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) (citing *Chambers*, 282 F.3d at 153).

The foregoing principles resolve the dispute between the parties as to the documents the Court may consider in resolving the motion to dismiss.  Plaintiff relied on the Proxy (Ex. A) extensively in formulating his Complaint, *see, e.g.*, 2d Am. Compl. ¶¶ 3-17, 21, 75, 81-90, 97-103, it is integral to the complaint, and was filed with the SEC; he does not dispute the accuracy of its description of the background of the Merger or that he had notice of it; and at oral argument, he admitted that the Complaint incorporates it by reference, *see* Transcript, Dkt. No. 44 at 29.  It is properly considered on the motion to dismiss.  *See, e.g., Roth*, 489 F.3d at 510-11; *Soueidan v. Breeze-Eastern Corp.*, 2017 WL 627456, at *4-5 (S.D.N.Y. Feb. 15, 2017) (considering Schedule 14D-9 and Amended 14D-9 Forms because the complaint had cited and relied on those documents).

21

Plaintiff also relied upon and referenced Wesco's publicly-reported financial results for the second and third quarters of 2019.  *See, e.g.*, 2d Am. Compl. ¶¶ 6, 79.  As Defendants note, Plaintiff has asked the Court to assume the accuracy of that financial information in its argument that Wesco's Updated Management Projections were false and misleading.  *See* Dkt. No. 35 at 4. It is therefore proper for the Court to consider Wesco's public filings with the SEC regarding those quarters, including Wesco's May 2, 2019 Form 8-K (Ex. B) which discusses the second quarter results, and its August 8, 2019 Form 10-Q (Ex. C), which discusses the third quarter results.  "If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true."  *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013); *see also In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004) ("[t]he court need not accept as true an allegation that is contradicted by the documents on which the complaint relies."); *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

The Court declines to consider or take judicial notice of Wesco's November 25, 2019 8-K (Ex. E) or its November 26, 2019 Form 10-K (Ex. F) disclosing respectively Wesco's fourth quarter and full year 2019 financial results.  Although both of these documents were publicly filed with the SEC of which the plaintiff had notice, and are thus arguably the proper subject of consideration on a motion to dismiss, Plaintiff does not rely on them for his Complaint, nor are they integral to his Complaint.  These documents were filed after the date that the Proxy was mailed and after the date of the shareholder vote.  The Court similarly declines to consider or take notice of the Wesco's October 24, 2019 press release announcing shareholder approval of the merger (Ex. D).

**DISCUSSION**

In order to plead a violation of Section 14(a) and Rule 14a-9 thereunder, Plaintiff must allege facts showing a proxy statement "contain[ed] any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).  "A fact is material for purposes of Rule 14a-9 if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."  *Koppel v. 4987 Corp.*, 167 F.3d 125, 131 (2d Cir. 1999) (quoting *United Paperworkers Int'l Union v. Int'l Paper Co.,* 985 F.2d 1190, 1198 (2d Cir. 1993) (internal quotation marks and citations omitted)).  Plaintiff must allege that the misstatement or omission caused his injury, *see Grace v. Rosenstock*, 228 F.3d 40, 47 (2d. Cir. 2000) ("[L]oss causation . . . must be proven in the context of a private action under § 14(a)") (citations omitted), and "the proxy solicitation itself, rather than the particular defect in the solicitation materials, [must be] an essential link in . . . the transaction. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385 (1970).  Thus, in sum, a claim is sustained if Plaintiff alleges facts that (1) the Proxy contained a material misrepresentation or omission, which (2) caused his injury, and (3) that the Proxy itself, rather than the particular defect in the solicitation materials, was an essential link in accomplishing the merger.  *Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003) *aff'd*, 87 F. App'x 772 (2d Cir. 2004).[5]

---

[5] Section 14(a) of the Securities Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a).  Rule 14a-9(a), promulgated under Section 14(a), provides:

Defendants argue that Plaintiff has not stated a claim for relief because (1) the management projection statements are protected by the PSLRA safe-harbor; (2) in the alternative, the management projection statements are non-actionable opinion not sufficiently alleged to be false or misleading; (3) Plaintiff does not allege that the CEO statement is false or misleading; and (4) Plaintiff fails to plead loss causation.  For the reasons that follow, the Court agrees.

**A.      The Management Projection Statements Are Protected by the Safe Harbor for Forward-Looking Statements and Are Otherwise Non-Actionable**

Subject to certain limited exceptions, the PSLRA protects a defendant in any private action against liability for federal securities law violations based on "any forward-looking statement, whether written or oral."  15 U.S.C. § 77z-2(c)(1).  The statute defines forward-looking statements to include:

(A) A statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

---

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a).

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

The Second Circuit has held that "[a] statement may contain some elements that look forward and others that do not," and "forward-looking elements" may be "severable" from "non-forward-looking" elements. *In re Vivendi, S.A. Securities Litig.* 838 F.3d at 246 (citing *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010)).  Under the PSLRA, a defendant is not liable "with respect to any forward-looking statement, whether written or oral, if and to the extent" that:

(A) the forward-looking statement is –

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity, was—
(I) made by or with the approval of an executive officer of that entity, and
(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

"The safe harbor is written in the disjunctive." *Slayton*, 604 F.3d at 766.  A defendant is not liable for a forward-looking statement if (1) "the forward-looking statement is identified and accompanied by meaningful cautionary language," or (2) the forward-looking statement "is immaterial," or (3) "the plaintiff fails to prove that [the forward-looking statement] was made

with actual knowledge that it was false or misleading." *Slayton*, 604 F.3d at 766.  As long as the plaintiff fails to satisfy one of those elements (*e.g.,* the statement is accompanied by meaningful cautionary language or is immaterial), the presence of one of the other elements (*e.g.*, the statement was known to be false or misleading) will not subject to the defendant to liability.  *Id.*; *see In re Vivendi*, 838 F.3d at 245-46 ("Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies.") (internal quotation marks and citation omitted).

### 1.    The Management Projection Statements Are "Forward-Looking" Within the Meaning of the PSLRA

Here, each of the Management Projection Statements—to the extent that they are alleged to be false at all—constitutes a forward-looking statement.  The Updated Management Projections themselves (Statement 1 described above) were plainly forward-looking statements. *See Slayton*, 604 F.3d at 76.  They fall squarely within the definition of "a statement containing a projection of . . .  income (including income loss), earnings (including earnings loss) per share, . . . or other financial items" and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management."  15 U.S.C. § 78u-5(i)(1)(A) & (C).  The Proxy prominently states: "CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS." Proxy 34.  It reflects that the Proxy "may include 'forward-looking' statements within the meaning of the U.S. securities laws."  It then goes on to state:

> Forward-looking statements generally include statements that are predictive in nature and depend upon or refer to future events or conditions, and include words such as "believes," "plans," "anticipates," "projects," "estimates," "expects," "intends," "strategy," "future," "opportunity," "may," "will," "should," "could," "potential" or other similar expressions, or the negative of these terms or comparable terminology.

Proxy at 34.

That is precisely the type of language that is used with respect to the Initial Management Projections and the Updated Management Projections both of which are described as "forward-looking statements." *Id.* at 75. In particular, the Proxy makes clear that the Management Projections "reflect numerous variables, assumptions and estimates as to future events" and that they are not "fact and should not be relied upon as being necessarily indicative of actual future results." *Id.*

The statements Plaintiff challenges regarding the Financial Advisors' use of the Updated Management Projections (Statement 2 described above) and the Board's reliance on the Financial Advisors' opinion (Statement 3 described above) also constitute statements containing a projection or estimate and therefore qualify as forward-looking statements under the statute. Plaintiff does not challenge these statements based on any representation they make regarding present or historical fact. Rather, the essence of Plaintiff's challenge is that each statement adopts or endorses the Updated Management Projections, which Plaintiff claims are "illegitimate and did not accurately reflect the implied value of the Company's shares and the fairness of the Merger Consideration." 2d Am. Compl. ¶ 9. The most explicit alleged endorsement of the Updated Management Projections is the Proxy's statement that the Wesco Board "believed [that the assumptions and variables underlying the Updated Management Projections] were reasonable" at the time they were prepared. Proxy 75; *See* 2d Am. Compl. ¶ 11.

Further, statements about the fairness opinion are alleged to be false or misleading because they state the assumption—upon which the Financial Advisors relied in preparing the opinion—that the "financial analyses and forecasts . . . were reasonably prepared based on assumptions reflecting the best currently available estimates and judgments by management as to the expected future results of operations and financial condition of the Company." *See* 2d Am.

27

Compl. ¶¶ 11, 89.  The statement identifying the fairness opinion as among the "Reasons for the Merger" are alleged to be misleading because they reflect that the Board considered the fairness opinions from the Financial Advisors to be a positive factor while the fairness opinions were based on projections that—it is alleged—the Board knew were fraudulently understated.  *Id.* ¶¶ 10, 88.  Finally, the repeatedly stated "determination" of the Board that the merger is "fair to and in the best interests of" stockholders is alleged to be false and misleading, once again, because the management projections ostensibly supporting that determination are known by the Board to be fraudulent.

These statements too are the paradigmatic forward-looking statements protected by the safe harbor.  They are statements reflecting a belief in, and adoption of, the Updated Management Projections.  In essence, as the Complaint itself demonstrates by its pleadings, the allegations turn on the reasonableness of the Updated Management Projections and the judgment that those projections—rather than the Initial Management Projections—best reflect management's judgment about the future performance of Wesco.  If those projections were reasonable, the Complaint seems to reflect, there would be no basis to challenge them.  And, if the projections were not reasonable, the Complaint alleges, the Proxy contains a false or misleading statement.  That is precisely the inquiry that the safe harbor puts off-limits to the courts.

Courts within this Circuit have found that statements which merely endorse or state the speaker's belief in a certain future outlook satisfy the PSLRA forward-looking requirement.  *See, e.g.*, *Gissin v. Endres*, 739 F. Supp. 2d 488, 507 n.108 (S.D.N.Y. 2010) (statements that "based on our current expectation of cash flows from operations and . . . investments . . . we feel we will be in a position to fund [anticipated] capital investments for the year" and "based on our current

view and what we know now, yes, we think we'll be just fine" were forward looking);

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes, Inc.*, 2013 WL 1188050, at *17 (D. Conn.

Mar. 23, 2013) (finding, among other things, that the statement "we're comfortable with our

[projection] . . ." was forward looking).  The Third Circuit's opinion in *Inst. Investors Grp. v.*

*Avaya* is instructive here: in that case, the court determined that statements that the

defendant-company was "on track" and "position[ed] . . . to meet our goals for the year" were

forward-looking, as they "cannot meaningfully be distinguished from the future projection of

which they are a part" and "express[] only defendants' continuing comfort with the earlier . . .

projection."  564 F.3d at 255-56.

    The district court opinions in *City of Hialeah Employees' Retirement Sys. v. FEI Co.*, 289

F. Supp. 3d 1162 (D. Or. 2018), and *Golub v. Gigamon*, 372 F. Supp. 3d 1033 (N.D. Cal. 2019),

thus are directly on point.  In both cases, the courts rejected claims materially identical to those

here.

    In *City of Hialeah*, for example, as here, the management of defendant FEI prepared two

sets of projections (the "Higher Projections" and "Lower Projections").  There, the Higher

Projections were based on department-specific projections and the Lower Projections adjusted

the Higher Projections based on the views of senior management with respect to group-level

dynamics.  289 F. Supp. 3d at 1167.  The company used the Higher Projections in making an

acquisition and later in soliciting offers to potential bidders for FEI's own business.  *Id.* at 1167-

68.  After two of the three potential bidders for FEI decided not to pursue an acquisition, FEI's

board determined that the Higher Projections were unrealistic and directed its financial advisor to

prepare a fairness opinion assessing the bid of the third, remaining party, which the advisor did

based on the Lower Projections.  *Id.*  The allegation made there was identical to that made here:

"[T]he Board knew that using the Lower Projections would result in a lower estimate of the intrinsic value of FEI, thereby making a share price close [to the offer] appear fair." *Id* at 1169. As here, the proxy soliciting FEI shareholder approval of the merger contained both sets of projections but stated that the Board had directed the advisor to base its fairness opinion analysis on the Lower Projections because those "were more likely to reflect the future business performance of FEI on a standalone basis than would the [Higher Projections]." *Id.* at 1169 (internal quotation marks and citation omitted). Plaintiff sued, claiming that the individual defendants had an interest in consummating the transaction because they secured liquidity for "hundreds of thousands" of shares of illiquid FEI stock they held and accelerated the vesting of unvested stock options and restricted stock units. As does Plaintiff here, plaintiffs there claimed that the proxy's statement that the Higher Projections were unrealistic as well as the use of the Lower Projections by the advisors was false and misleading. *Id.* at 1169-70.

In *Golub*, the defendant company used one set of projections, the "base-case stand-alone business plan" ("Case B") in soliciting bids. 372 F. Supp. 3d at 1040. After solicitation for bids resulted in only one bidder remaining to purchase the company (and only at a price level at or below the low-end of Case B), and after the company had announced quarterly results that were disappointing, the board refreshed the projections and directed the financial advisors to use the more conservative Case C projections which represented a downside case believing the Case B projections "were no longer appropriate given recent performance and third quarter results." *Id.* at 1041. As here, the financial advisors concluded that the merger consideration was fair based on the updated, and more conservative, revised Case C projections. *Id.* The proxy described the merger as fair based on the updated Case C projections and the fairness opinion that relied on them without even disclosing the updated Case B projections. *Id.* at 1042. Plaintiff sued under

Section 14(a), alleging that the proxy should have disclosed the Case B projections, that the "portions of the Proxy Statement that discuss how and why the Board chose to rely on the Updated Case C projections rather than the Case B Projections were false in order to hide an attempt by the Board to find a way to ensure that [the bidder's] offer price . . . could be declared fair." *Id.* Plaintiff there noted, as plaintiff argues here, that the use of the Case C projections was inconsistent with management statements "tout[ing] the company's success and reliable growth and publicly express[ing] zero doubts" and with analyst statements that valued the company at a higher price than that implied by the projections. *Id.* Plaintiff further argued that the projections were suspect because "the Board only directed [the financial advisor] to use the Updated Case C Projections two days before entering into the Merger Agreement to give the illusion that the Acquisition was 'fair.'" *Id.*

Both courts rejected the claims, holding that the challenged statements were "forward-looking" and protected by the PSLRA safe harbor, and granted defendants' motion to dismiss. *City of Hialeah*, 289 F. Supp. 3d at 1172; *Golub*, 372 F. Supp. 3d at 1047-48. Both courts specifically considered the question whether the Proxy contained "mixed statements" (*i.e.*, containing non-forward-looking statements about current and past facts as well as forward-looking statements about projected growth in revenue and earnings) taking them out from the protection of the safe harbor and concluded that they did not. The safe harbor, the *City of Hialeah* court reasoned, does not protect "statements of present or historical fact" such as the Board's description of how the projections were developed or "the facts supporting a projection." *City of Hialeah*, 289 F. Supp. 3d at 1173. But the statements challenged by plaintiff were not properly characterized as "statements of present or historical fact" outside the scope of the safe harbor. The form of plaintiffs' challenge in both cases was that the two companies could not

31

have believed the projections in light of recent performance, *i.e.*, they were contrived, in the *Golub* court's words, "to ensure that . . . the offer price . . . could be declared fair."  372 F. Supp. 3d at 1047; *see also City of Hialeah*, 289 F. Supp. 3d at 1173 (characterizing plaintiffs as arguing that "the Board did not really believe what it said it believed").  The courts decisively and persuasively rejected those claims.  *City of Hialeah* stated, and *Golub* echoed:

> To take the view that an expression of present belief in a forward-looking statement is a present fact – and therefore not itself a forward looking statement – would work an end-run around the PSLRA's safe harbor provision.  Expressing confidence or lack thereof in a given projection is not different from making a projection.  Every statement of a future projection carries at least the implicit assertion that the speaker or writer of that statement believes it. . . . [A] defendant's statement of its belief in or preference for a given projection is itself a forward-looking statement that is protected.  The Board's assessment that the Higher Projections were significantly less likely to reflect a reasonable estimate of FEI's future performance was therefore a forward-looking statement entitled to protection.

*Golub*, 372 F. Supp. 3d at 1048 (quoting *City of Hialeah*, 289 F. Supp. 3d at 1173); *see also In re Analogic Corp. Shareholder Litig.*, 2019 WL 4804800, at *8 (D. Mass. Sept. 30, 2019) (dismissing Section 14 claim based on allegations that Board of an acquired company used lowered projections "only after it became apparent that the Board and the [Special] Committee needed to make an offer . . . look attractive because the Board was under pressure to sell" and holding that statements that projections were used because they were the "best currently available" was forward-looking).

This case is materially indistinguishable from *City of Hialeah*, *Golub*, and *Analogic*. Plaintiff challenges the reasonableness of the Updated Management Projections and whether they appropriately take into account the factors they are said to be based upon including "trends in the industry and markets in which the Company operates and the recent performance of the business."  Proxy 71.  He does not dispute, however, any of the present or historical facts Wesco stated with respect to the Updated Management Projections, including that they were prepared in

July 2019 at the request of the Strategic Alternative Committee after the Board had asked management to review "the key assumptions and sensitivities to the Initial Management Projections" in light of "recent trends in the Company's financial performance" and that they were used by the Financial Advisors in connection with the preparation of their fairness opinions.  Proxy 45.  Plaintiff also does not challenge the accuracy of any of the historical facts or assumptions on which management was said to have based the Updated Management Projections, and nor could he; the Proxy's description of the basis for the Updated Management Projections is stated in general form without reference to any specific fact.  Rather, Plaintiff claims that the Updated Management Projections were "illegitimate[], 2d Am. Compl. ¶¶ 9, 88, could not have been believed, and thus could not have been a "positive factor[]" supporting the board's determination to recommend the merger.  2d Am. Compl. ¶ 10.

Thus, the Management Projection Statements that Plaintiff challenges are quintessentially forward-looking under the safe harbor.  Just as in *City of Hialeah*, *Golub*, and *Analogic*, here "[t]o take the view that an expression of present belief in a forward-looking statement is a present fact – and therefore not itself a forward looking statement – would work an end-run around the PSLRA's safe harbor provision."  *City of Hialeah*, 289 F. Supp. 3d at 1173; *see Golub*, 372 F. Supp. 3d at 1048 (quoting same); *In re Analogic Corp. Shareholder Litig.*, 2019 WL 4804800, at *8 (quoting same).

Indeed, all statements of projections come with the implied statement that they are believed and are based on recent trends in the industry and the market and the performance of the business.  That is inherent in the notion of a projection—it is "the phenomenon of making calculated guess into the future according to past trends."  Black's Law Dictionary Online, "projection" (2d ed.).  The PSLRA says that projections are protected unless they are both (a)

actually known to be false and (b) not accompanied by meaningful cautionary language. *Slayton*, 604 F.3d at 766; 15 U.S.C. § 78u-5(c). To hold that such projections should be excepted from the PSLRA's coverage on the theory that management did not appropriately consider recent trends in the industry or the performance of the business would rip a large hole in that statute and deprive issuers and makers of such statements of the precise protection the safe harbor was intended to provide.

The cases upon which Plaintiff rely are inapposite. In *In re Vivendi S.A. Securities Litig.*, 838 F.3d 223, 246 (2d Cir. 2016), the court held that certain false and misleading "present representations" that were "embedded within statements that Vivendi deem[ed] forward-looking" could support a jury verdict notwithstanding the PSLRA safe harbor. But those actionable representations were ones of present or historical fact such as that the company had "a very strong balance sheet" or had achieved its incremental EBITDA targets. *Id.* at 246. The Court did not question that statements of the company's "confidence" in its targets were forward-looking within the meaning of the PSLRA safe harbor. *Id.*

The Ninth Circuit's decision in *In re Quality Sys., Inc. Securities Litig.*, 865 F.3d 1130 (9th Cir. 2017), is to similar effect. The court there stated the unexceptional proposition that "the safe harbor [is not] designed to protect [companies] when they make a materially false statement about current or past facts, and combine that statement with a forward-looking statement." *Id.* at 1142. But the statements that it held to be potentially actionable were indisputably ones that made representations about current or past facts such as the current state of the company's sales pipeline. It did not hold that a statement of confidence in a company's projections or that the company believed that such projections were positive factors were somehow excepted from the safe harbor protection. *See also In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS

1350, at *39 (S.D.N.Y. Feb. 1, 2005) (statements of reasons why company embarked on the development of a drug as well as the tolerability of the drug and its lack of serious adverse effects not forward-looking).

Viewed through the appropriate lens, the other district court cases Plaintiff relies upon do not support the result for which it contends in this case.  In *Baum v. Harman Int'l*, 408 F. Supp. 3d 70, 83 (D. Conn. 2019), the court sustained a Section 14(a) challenge against the claim that the defendant was protected by the PSLRA safe harbor only because the representation at issue contained a statement of historical fact that was alleged to be false—that a set of projections were overly optimistic because the projections "contained greater downside risk than upside potential."  In other words, the statements at issue did not just reflect management's assessment of the projections but an alleged false statement of fact supporting that assessment.  Elsewhere, the court emphasized that a statement that reflected the company's "assessment of the Management Projections, rather than an assumption on which the Management Projections were based," *id.* at 86, would be forward-looking within the meaning of the PSLRA.  Indeed, to the extent that Plaintiff would read *Baum* to hold that a statement that management believed its projections and thought they were positive could be excepted from the safe harbor on the factual allegation that management did not believe the projections, *see* Dkt. No. 27 ("Pl. Opp'n") at 5, that proposition would be flatly contrary to the PSLRA's disjunctive test for subjecting a forward-looking statement to liability: plaintiff must allege both that the maker actually knew the projections to be false *and* that the statements were not accompanied by meaningful cautionary language.  15 U.S.C. § 78u-5(c).

Most of the other cases cited by Plaintiff address allegedly false statements of present or historical fact that are distinguishable from the facts of this case.  *See Azar v. Blount Int'l, Inc.*,

2017 WL 1055966 (D. Or. Mar. 20, 2017) (sustaining a claim where management hid internal projections inconsistent with those published in Proxy); *NECA-IBEW Pension Trust Fund v Precision Castparts Corp.*, 2017 U.S. Dist. LEXIS 165139, at *32-34 (D. Or. Oct. 3, 2017) (sustaining Section 14(a) claims where defendant's statement that future acquisitions were "inherently uncertain" and therefore not included in projections was contradicted by evidence that the company was in the process of completing two acquisitions at the time forecasts were prepared); *Laborers' Local #231 Pension Fund v. Cowan*, 2018 U.S. Dist. LEXIS 110345 (D. Del. July 2, 2018) (defendant falsely stated that forecasts accounted for transactions or events that were anticipated when the forecasts were prepared, and was contradicted by evidence that management failed to account for known acquisitions in the pipeline); *Baumgarner v. Williams Cos.*, 2016 U.S. Dist LEXIS 72540, at *9 (N.D. Okla. June 3, 2016) (defendant's false statement of present or historical fact as to why it chose to reduce projected synergies not forward-looking within meaning of PSLRA); *Chester Cty. Employees Ret. Fund v. KCG Holdings, Inc.*, 2019 WL 2564093 (Del. Ch. June 21, 2019) (holding that the company should have disclosed earlier-prepared projections, and that the fact that the updated projections were prepared last minute, after the merger was agreed upon, casts doubt on their reliability).[6]  No such allegation is made here.

## 2.    The Management Projection Statements Were Accompanied By "Meaningful Cautionary Language"

Once it is understood that Wesco's statements were forward-looking, this case is readily disposed.  The statements were accompanied by meaningful cautionary language and Plaintiff does not sufficiently allege that the maker had actual knowledge of falsity.

---

[6] *In re Hot Topic Sec. Litig*., 2014 WL 7499375 (C.D. Cal. 2014) and *Envision Healthcare Corp*, 2019 WL 4536554 (D. Del. Sept. 19, 2019) are not on point at all.  Neither court there considered a PSLRA safe harbor argument.

A defendant who publishes a forward-looking statement is protected against liability in a private action under the federal securities laws if that statement is accompanied by "meaningful cautionary language." *Slayton*, 604 F.3d at 771; *In re Phillip Morris Int'l Sec. Litig.*, 2020 WL 550769, at *17 (S.D.N.Y. Feb. 4, 2020). The cautionary language need not directly precede or follow the forward-looking statement for it to be meaningful. *See Slayton* 604 F.3d at 768-69 (noting that the cautionary language was several pages away). However, the language must not be mere "boilerplate." The issuer must list "important factors that could realistically cause results to differ materially." *Slayton*, 604 F.3d at 773. In other words, the language must be "extensive and specific," *id.* at 772 (quoting *Avaya*, 564 F.3d at 256), and contain "substantive company-specific warnings." *Id.* (quoting *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004)). As the Conference Report accompanying the PSLRA explains, the cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business." Conference Report at 43, 1995 U.S.C.C.A.N. at 742.

The Proxy language clearly meets that standard. The Proxy contained extensive and specific discussion of a large number of company-specific factors that the Company indicated could cause its results to be either "materially better or worse" than the results reflected in the Updated Management Projections. *See* Proxy 74. Those included, but were not limited to, "conditions in the credit markets, changes in military spending, risks unique to suppliers of equipment and services to the U.S. government, risks associated with the loss of significant customers, a material reduction in purchase orders by significant customers, or the delay, [and] scaling back or elimination of significant programs on which the Company relies." It also

included "risks associated with the Company," "the Company's ability to successfully execute and realize the expected financial benefits from its Wesco 2020 initiative," "risks associated with the Company's international operations," "risks related to the handling, transportation and storage of chemical products," "risks related to the aerospace industry and the regulation thereof," "risks related the Company's indebtedness," and a host of other factors and risks. Proxy at 74-75. No more was required. *See, e.g.*, *In re Phillip Morris International Inc. Sec. Litig.*, 2020 WL 550769, at *17 (finding that similar language was meaningfully cautionary); *City of Hialeah*, 289 F. Supp. 3d at 1174 (same).

Indeed, it is worth quoting the language in full as it highlights the meaningfulness of the cautionary language provided:

> The Management Projections were not prepared with a view to public disclosure and are included herein only because such information was made available as described above. The Management Projections were not prepared with a view to compliance with GAAP, the published guidelines of the SEC regarding projections and forward-looking statements or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. Furthermore, PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, has not examined, reviewed, compiled or otherwise applied procedures to the Management Projections and, accordingly, assumes no responsibility for them and expresses no opinion on them. . . .
>
> Although a summary of the Management Projections is presented with numerical specificity, they reflect numerous variables, assumptions and estimates as to future events made by the Company's management that management believed were reasonable at the respective times the Management Projections were prepared, taking into account the relevant information available to management at the time the Management Projections were prepared. However, this information is not fact and should not be relied upon as being necessarily indicative of actual future results. Important factors that may affect actual results or financial condition and cause the Management Projections not to be achieved include general economic and industry conditions, conditions in the credit markets, changes in military spending, risks unique to suppliers of equipment and services to the U.S. government, risks associated with the loss of significant customers, a material reduction in purchase orders by significant customers, or the delay, scaling back or elimination of significant programs on which the Company relies, the Company's ability to

effectively compete in its industry, risks associated with the Company's long-term, fixed-price agreements that have no guarantee of future sales volumes, the Company's ability to effectively manage its inventory, the Company's suppliers' ability to provide it with the products the Company sells in a timely manner, in adequate quantities and/or at a reasonable cost, while also meeting the Company's customers' quality standards, the Company's ability to maintain effective information technology systems and effectively implement its new warehouse management system, the Company's ability to successfully execute and realize the expected financial benefits from its Wesco 2020 initiative, the Company's ability to retain key personnel, risks associated with the Company's international operations, including exposure to foreign currency movements, changes in trade policies, risks associated with assumptions the Company makes in connection with its critical accounting estimates (including goodwill, excess and obsolete inventory and valuation allowance of the Company's deferred tax assets) and legal proceedings, changes in U.S. income tax law, the Company's dependence on third-party package delivery companies, fuel price risks, fluctuations in the Company's financial results from period-to-period, environmental risks, risks related to the handling, transportation and storage of chemical products, risks related to the aerospace industry and the regulation thereof and risks related to the Company's indebtedness. In addition, the Management Projections do not take into account any circumstances or events occurring after the date that they were prepared and do not give effect to the Merger or the other transactions contemplated by the Merger Agreement. As a result, there can be no assurance that the Management Projections will be realized, and actual results may be materially better or worse than those contained in the Management Projections. Since the Management Projections cover multiple years, that information by its nature becomes less predictive with each successive year. The inclusion of this information should not be regarded as an indication that the Board, Wesco Aircraft, the Company's financial advisors, Parent, Parent's representatives and affiliates (including Platinum) or any other recipient of this information considered, or now considers, the Management Projections to be material information of Wesco Aircraft or that actual future results will necessarily reflect the Management Projections, and the Management Projections should not be relied upon as such. The summary of the Management Projections is not included herein to induce any stockholder to vote in favor of the Merger Proposal or any of the other proposals to be voted on at the special meeting or to influence any stockholder to make any investment decision with respect to the Merger, including whether or not to seek appraisal rights with respect to shares of Wesco Aircraft common stock.

The Management Projections should be evaluated, if at all, in conjunction with the historical financial statements, risk factors and other information regarding Wesco Aircraft contained in our public filings with the SEC. See "*Where You Can Find More Information*" on page 143 of this proxy statement. The Management Projections are forward-looking statements. For information on factors that may cause Wesco Aircraft's future results to materially vary, see "*Cautionary Statement Concerning Forward-Looking Statements*" on page 34 of this proxy statement.

Proxy, 74-75.

Plaintiff nonetheless argues that the language was not sufficiently cautionary because it failed to disclose that the "projections were not actually prepared on a reasonable basis and in good faith, and did not reflect management's best estimates."  Pl. Opp'n at 16-17 ("for the cautionary language to be sufficient to address Plaintiff's claims, the Proxy would need to disclose that, contrary to what it said about the Updated Management Projections, those projections were not actually prepared on a reasonable basis and in good faith, and did not reflect management's best estimates.").[7]  This argument conflates the actual knowledge and meaningful cautionary language prongs of the PSLRA.  If the Court were to accept it, an allegation of actual knowledge of falsity would suffice to deprive a forward-looking statement of the protections of safe harbor even if there were meaningful cautionary language otherwise.  Such a result would be contrary to the disjunctive nature of the safe harbor elements.  *See Slayton*, 604 F.3d at 766. *In re Quality Sys.*, 865 F.3d at 1148, on which Plaintiff relies, is not to the contrary.  The very quote Plaintiff cites, "no cautionary language short of an outright admission that the non-forward-looking statements were materially false or misleading would have been adequate" demonstrates the distinction; there the Court determined that the statements at issue were not "non-forward-looking" statements of fact that therefore fell outside the protection of the safe harbor.  There are no such present statements of present or historical fact here.  Either cautionary language or an absence of knowledge is alone sufficient to trigger the safe harbor.

---

[7]  Plaintiff repeated this argument at oral argument.  *See* Tr., Dkt. No. 44, 25.

3.      **Plaintiff Has Failed to Allege That Any Defendant Had Actual Knowledge That The Statements Were False or Misleading**

Forward-looking statements are also protected if "the plaintiff failed to prove the statements were made with actual knowledge that they were false or misleading." *Frankfurt-Trust Inv. Luxemburg AG v. United Tech. Corp.*, 336 F. Supp. 3d 196, 217 (S.D.N.Y. 2018).  As noted above, the "actual knowledge" standard for forward-looking statements is stricter than for statements of current fact.  It requires "actual knowledge" or "proof of knowing falsity;" recklessness is not sufficient.  *See Slayton*, 604 F.3d at 773.

Plaintiff makes four arguments that Renehan, Wesco's CEO, had "actual knowledge" that the Updated Management Projections and related statements about the Board and Financial Advisors were false and misleading:[8] (1) he had a motive to accept even Platinum's low-ball offer because he had an offer of employment and stood to gain "lucrative golden parachute compensation from the consummation of the merger, 2d Am. Compl. ¶ 115;[9] (2) the Updated Management Projections were inconsistent with the prior (public) statements of Renehan and Wesco; (3) the Updated Management Projections were prepared shortly before Wesco's Board decided to accept Platinum's revised offer; and (4) the Updated Management Projections were inconsistent with analyst expectations.  None of these allegations is sufficient to surmount the high bar of actual knowledge.

First, to plead scienter under the PSLRA on a theory of motive and opportunity, as Plaintiff attempts to do, it is *at least* necessary to establish both "concrete benefits that could be

---

[8] Plaintiff claims that Renehan, as a "member of Company management, the SAC, and the Board . . . was responsible for the commission, production, and approval of both sets of projections." Pl. Opp'n. 18.  For purposes of this opinion only, the Court assumes that such allegations are sufficient to render him a "maker" of the forward-looking statements.  The Proxy only ever avers that "management" prepared the projections.  *See e.g.*, Proxy 41, 45.

[9] Plaintiff also challenges the motives of the Financial Advisors and the members of the SAC, *see 2d Am. Compl.* 107-22, which is also addressed below.

realized by one or more of the false statements . . . alleged" as well as "the means and likely prospect of achieving concrete benefits by the means alleged." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir. 1994)).  Such motive and opportunity must be stated "with particularity."  15 USC 78u-4(b)(2).

Plaintiff does not allege facts but only "speculation," *see Twombly*, 550 U.S. at 555, in support of its argument that CEO Renehan had a motive and opportunity to consummate a transaction the expense of shareholders in the form of a job offer as CEO of the combined company.  The facts alleged in the Complaint and contained in the documents incorporated therein are that at the time of the merger, Platinum had made no promise to CEO Renehan or Wesco that Renehan would become CEO of the combined company, nor had Wesco or Renehan made any promise to Platinum that Renehan would stay as CEO.  *See* Merger Agreement, Dkt. No. 26, Appendix A.  At some point after the Merger Agreement was signed, and by the time the Merger was closed, Renehan agreed to become CEO of the combined company.

These facts do not satisfy the requirement to state "with particularity," 15 U.S.C. § 78u-4(b)(2), facts that Renehan possessed "the means and likely prospect of achieving concrete benefits by the means alleged." *Novak*, 216 F.3d at 311.  Nor do they create an inference of scienter that is "cogent and at least as compelling as [an] opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314.  Plaintiff offers no facts from which it could even plausibly be inferred that the offer was conveyed before the merger was approved by the shareholders.  In fact, the inference to be drawn from these facts is the opposite of what Plaintiff would conjure.  By recommending the Merger, Renehan was trading his sure current position as CEO of Wesco for the uncertainty about whether or not he would have a job with the new combined company.  Plaintiff's further claim that the Merger resulted in Renehan "cash[ing] in

on millions of dollars in lucrative golden parachute compensation," 2d Am. Compl. ¶ 115, is likewise insufficient to render a claim of scienter plausible, as it merely states a generalized incentive commonly available to corporate executives. *See South Cherry Street, LLC v. Hennessee Group*, 573 F.3d 98, 109 (2d Cir. 2009) ("[I]n attempting to show that a defendant had fraudulent intent, it is not sufficient to allege goals that are 'possessed by virtually all corporate insiders,' such as . . . the desire to [achieve results] in order to increase executive compensation"); *No. 84 Employer-Teamster Joint Council Pension TrustFund v. Am. West Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (motive that officers issued false statements so that they could sell company and trigger golden parachute "too generalized to establish scienter" under the PSLRA).[10]  Further, the allegation of motive and opportunity in the form of Renehan's golden parachute compensation is undermined by the plausible inference of uncertainty over future employment described above.

Thus, Plaintiff's claim of motive and opportunity fails to meet the general scienter pleading standard under the PLSRA, much less the heightened standard of actual knowledge. *See Slayton*, 604 F.3d at 773.

Second, Plaintiff relies on the prior statements of Wesco and Renehan that Plaintiff claims were inconsistent with the rationale provided for the Updated Management Projections in the Proxy.  *See Novak*, 216 F.3d at 300 (scienter can be established on a recklessness theory (a lower standard than applies here) where Plaintiff "specifically allege[s] defendants' knowledge

---

[10] For similar reasons, Plaintiff's claims that "three of the four members of the SAC . . . were tied to investment managers and hedge funds that had interests different from or in addition to Wesco's common stockholders" (2d Am. Compl. ¶ 109) and that the Financial Advisors were conflicted because they had relationships with those funds is similarly inadequate.  "General allegations that the defendants acted in their economic self-interest are not enough [to plead a strong inference of scienter under the PSLRA.]"  *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2000).  Therefore, by definition, they cannot establish actual knowledge.

of facts or access to information contradicting their public statements").  Plaintiff's theory appears to go something like this:  In the months leading up to the Initial Management Projections, Wesco had announced disappointing news with respect to its margins and its EMEA business, 2d Am. Compl. ¶¶ 51, 55, 59; Plaintiff alleges that the Initial Management Projections "must have accounted for these trends that had been dragging down the Company's performance," *id*. ¶ 62; the results for Wesco's second and third quarters were consistent with if not better than these trends—the Company reported year-over-year increases in free cash flow, revenue, and profit, primarily driven by higher sales volume; and therefore, management could not have believed in the Updated Management Projections, which forecast poorer results in the future than the Initial Management Projections.

Those facts, particularly when combined with the second and third quarter results incorporated by reference, fail to create any inference of scienter, much less a strong one.  In the first instance, while it is reasonable to infer that the poor results prior to the second and third quarters were taken into account in the Initial Management Projections, Plaintiff does not allege how they were taken into account or more particularly what relationship those particular results had to the forecasted results.  The Proxy disclosure itself makes clear that the projections were based on a number of assumptions, including with respect to the market and economy as a whole and with respect to the company.  Thus, that the Initial Management Projections were made against a backdrop of poor prior performance does not establish that the assumptions underlying the Management Projections had not changed between when the Initial and Updated Management Projections were prepared.

Just as important, there is nothing inconsistent about Wesco's results in the second and third quarters of 2019 and its determination to update the projections or management's revised

view that updated projections would forecast poorer results.  The Proxy reflects that the Updated Management Projections were prepared after Platinum had "expressed concerns related to the Company's margins and inventory valuation reserves and fluctuations and the impact of these factors on the business."  Proxy 45.  Platinum subsequently reiterated this view, stating its belief that the Initial Management Projections were not reliable and that the third quarter results "were lower than projected and that the increasing margin pressures on the business outweighed the benefits of the anticipated synergies of the Company and Platinum's Pattonair business."  Proxy 47.  Indeed, these concerns are substantiated by the results described in the Proxy: Although there were positive trends in revenue and profit in the second and third quarters, as Defendants note, these periods also saw year-over-year and quarterly decreases in margin and operating income, and the third quarter saw a quarter-to-quarter decrease in profit as well as margin falling below the Initial Management Projections.  *Id*.

Thus, here too, Plaintiff's narrative fails to allege an inference of scienter that is cogent and as compelling as the alternative.  *Tellabs, Inc*., 551 U.S. at 314.  It is true, as Plaintiff alleges, that in August, upon disclosure of the Company's third quarter results, Renehan described robust sales growth, increased cash from operating activities, the development of multi-product distribution centers, and the expectation that "associated temporary costs are expected to decline significantly."  2d Am. Compl. ¶ 79.  It also is true, however, that with respect to the same results, the Proxy states, "while [Third Quarter] results showed revenue growth, the Company experienced lower margins and higher selling, general and administrative expenses."  Proxy 46.  The sets of statements and reports are not contradictory but can be easily reconciled.  *See Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016) (dismissing an allegation of fraudulent omission where there was "no plausible allegation that [the information omitted] conflicted with any

reasonable interpretation of Defendants' [challenged] statement . . .") (*citing Omnicare v. Laborers District Counsel Construction Industry*, 575 U.S. 175, 189 (2015)).

Third, Plaintiff's allegation that the Updated Management Projections were only prepared shortly before the Merger was approved and after "it became obvious . . . that bidders were unwilling to budge from their lowball offers," 2d Am. Compl. ¶ 71, fails to support an inference of actual knowledge that the forecast was false and misleading.  That the Initial Management Projections were prepared close to when Wesco first shopped the company to potential bidders does not necessarily mean that those projections were more reliable than the later projections; the more logical inference is to the contrary.  The Initial Management Projections were prepared months before the Merger was executed, before multiple prospective bidders had dropped out, and before the third quarter results were known.  There is no allegation in the Complaint that the Board or management for that matter had decided prior to the preparation of the Updated Management Projections to accept any bid to acquire the Company.  *Cf. In Re Envision Healthcare Corp.*, 2019 WL 3494407, at *1 (D. Del. Aug 1, 2019) (sustaining a Section 14(a) claim when revised projections were made shortly after bids to acquire were made).  The Proxy makes clear that the transaction was far from final and that in the ensuing days, Defendants countered Platinum's revised bid of $10.42 per share offered on July 31, 2019 with a demand for $12 per share; that Platinum responded with a revised proposal of $10.77 per share; that Defendants rejected that offer and demanded $11.63 per share; and that Platinum ultimately agreed on August 5 to pay $11.05 per share—a figure that represented a 13% implied premium to the closing share price on August 5, 2019, a 14% implied premium to the unaffected share price on May 24, 2019 (before news of a potential transaction leaked) and a 27.5% implied premium on the 90-day volume-weighted average price as of the same date.  Proxy at 46-47.  Plaintiff also

fails to allege or identify any reason why the Board would have wanted to go forward with a transaction if the Merger Consideration were not fair.  *See Vaughn v. Air Line Pilots Ass'n, Intern.*, 604 F.3d 703, 710 (2d Cir. 2010) (dismissing a claim where "Plaintiffs have offered no plausible explanation for why [Defendant] would believe that [the challenged action] would be in its self-interest").

Indeed, Plaintiff's argument comes close to establishing a "damned if you do, and damned if you don't" situation for any company's management.  Delaware law requires a company in the context of a cash-out merger to disclose all reliable management projections of the company's future performance even if those projections are not used as the basis for a fairness opinion.  *See In re PNB Holding Co. Shareholders Litig*., 2006 WL 2403999, at *15 (Del. Ch. Aug. 8, 2006); *see also Chester Cty Empl's Retirement Fund v. KCG Holdings, Inc.*, 2019 WL 2564093, at *13 (Del. Ch. March 20, 2019) (company should have disclosed earlier projections prepared in the ordinary course of business); *Chen v. Howard-Anderson*, 87 A.3d 648, 687-88 (Del. Ch. April 8, 2014) (denying summary judgment on claim that management should have disclosed projections).[11]  Failure to disclose such projections when they are or might be claimed to be reliable can subject company directors to a state-law claim for breach of the duty of disclosure.  *PNB Holding Co. Shareholders Litig*., 2006 WL 2403999, at *15.  At the same time, the law also requires the Board to use the best available *current* information to make a decision about whether or not to agree to a transformative transaction and to disclose the

---

[11] Plaintiff inaccurately cites *Chester County* for the broad, and incorrect, proposition that projections prepared shortly before a merger is approved are suspect.  To the contrary, in *Chester County*, the projections at issue were prepared only after the Board approved the merger consideration and to support the board's decision to accept merger consideration that was lower than the consideration the company had been offered and had rejected only days earlier.  2019 WL 2564093, at *13-14.

projections upon which the Financial Advisors actually relied.  *See, e.g.*, *In re Primedia, Inc. Shareholders Litig.*, 67 A.3d 455, 491-92 (Del. Ch. 2013) ("Delaware law requires that a board of directors give a meaningful, current recommendation to stockholders regarding the advisability of a merger . . .); *Aaronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) ("[D]irectors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them.").

It is indisputable that Wesco and its directors satisfied their obligations with respect to disclosure of projections here.  They disclosed both the Initial Management Projections and the Updated Management Projections; the first set of projections were arguably of value to shareholders even though they were less current and were not used.  But, by relying on the Initial Management Projections and arguing that any update of those projections is inherently suspect—if they differed from the Initial Management Projections—Plaintiff is arguing for a test that would subject to a lawsuit virtually any company that makes projections and wants to ensure they remain fresh—particularly, if as here, results and projections deteriorated over time.  By disclosing both sets of projections, as suggested by Delaware law, defendants would be providing any eager plaintiff the tools with which to file suit against any company in a cash-out merger and survive a motion to dismiss regardless whether that claim otherwise lacked any merit.

Fourth and finally, Plaintiff argues that the Updated Management Projections were inconsistent with analyst expectations, giving lie to the former.  2d Am. Compl. ¶ 19.  This argument is wrong on its face.  The analyst predictions averred to were estimates of what potential buyers would agree to offer Wesco in a merger.  *Id*.  But there is other, even stronger evidence of what potential buyers would agree to offer—what the potential buyers did offer.  The

Proxy reflects that upon reviewing the Initial Management Projections, several prospective bidders dropped out and decided not to offer anything, and no bid higher than Platinum's was ever made and even that after a negotiation.  There is no allegation that the Board inadequately marketed the company for acquisition.  The proposition that the Board had actual knowledge that analyst predictions of Wesco's value at merger was accurate (and that therefore the Updated Management Projections were false) is not "as compelling as [the] opposing inference" that the board assessed the Wesco's value in an acquisition at a level it fetched in the acquisition. *Slayton*, 604 F.3d at 774.

**B.      The Management Projection Statements Are Non-Actionable Opinion**

Even if the Court concluded that the alleged misstatements were not protected by the PSLRA safe harbor, it would conclude that they were nonactionable statements of opinion.  The federal securities laws penalize issuers for making material misstatements or omissions of fact; "a sincere statement of pure opinion is not an 'untrue statement of material fact'" and does not provide a basis for relief.  *Omnicare*, 575 U.S. at 186.  Thus, "a statement of opinion is not misleading just because external facts show the opinion to be incorrect."  *Id.* at 188.  Under this standard, liability for making a false statement of opinion may lie only under limited circumstances—if plaintiff pleads facts demonstrating either "'the speaker did not hold the belief she professed' . . . 'the supporting fact she supplied were untrue' . . . [or if] the speaker omits information whose omission makes the statement misleading to a reasonable investor."  *Tongue*, 816 F.3d at 209-10 (quoting *Omnicare*, 575 U.S. at 586).  The Supreme Court has emphasized that this standard will not be easy to satisfy.  For an omissions case, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and

in context." *Omnicare*, 575 U.S. at 194.  The Supreme Court added: "That is no small task for an investor."  *Id.*

As previously stated but reiterated here, Plaintiff does not allege Wesco literally made any misstatement of fact.  The challenged statements are ones of implied or actual opinion—that management believed the Updated Management Representations, that the Financial Advisors believed that the Updated Management Representations were reasonable, and that the Board believed that the fairness opinions based on the Updated Management Representations were a "positive factor."  These are classic statements of opinion.  *See, e.g., Tongue*, 816 F.3d 199 (pharmaceutical company's statements (1) that there was a "90% likelihood" of FDA approval and that it "currently anticipate[d] product approval," that it "expect[ed] a decision on [milestone drug] by the end of the year," and the drug offered a "strong and robust treatment effect" were non-misleading statements of opinion under *Omnicare*); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018) (statements that "we believe that we are on track to have these products reach the market in 2016," "[w]e believe we have or will have sufficient supply of formulated drugs to meet our commercial forecast," and "we believe that we basically made all the necessary filings [and] [i]t's just a matter of playing those out" were non-misleading statements of opinion under *Omnicare*); *Frankfurt-Trust Inv. Luxemburg AG*, 336 F. Supp. 3d at 227 (statements that defendant "expect[s] revenue to grow," "see[s] topline momentum," "still expect[s]" growth, "expect[s] stronger commercial aftermarket," is "on the right track," and is "moving along exactly in line" with expectations were non-misleading statements of opinion under *Omnicare*).

Plaintiff also has failed to allege facts supporting the strong inference that either Wesco's management or board did not hold the beliefs they professed.  *Tongue*, 816 F.3d at 209-10.  As

discussed above, the most cogent and compelling inference is that the Updated Projections were prepared and relied upon because management and the Board believed they were the most accurate projections and more reasonable than the projections prepared months before and without the benefit of the second and third quarter results.

Of course, a statement of opinion may be actionable if it omits information about the "facts going to the basis for the issuer's opinion … whose omission makes the statement misleading to a reasonable investor." *Omnicare*, 575 U.S. at 194.  But an issuer can defeat a claim if it "divulge[s] an opinion's basis, or else makes clear the real tentativeness of its belief." *Id.*  Wesco did both.  Its disclosure of the Updated Management Projections disclosed their "real tentativeness."[12]  The Proxy also divulged all of the information that Plaintiff now says was necessary to understand the basis for the Projections.  It disclosed the Initial Management Projections, it disclosed the circumstances under which the Initial Management Projections were prepared, it disclosed the Updated Management Projections, it disclosed the circumstances under which those Projections were prepared and that they were not prepared until after Wesco received what Plaintiff's characterize as a "lowball bid," and it disclosed the differences between the Initial Management Projections and the Updated Management Projections.  In short, the only

---

[12] With regard to the projections, the Proxy manifested contingency and tentativeness, stating:

> Although a summary of the Management Projections is presented with numerical specificity, *they reflect numerous variables, assumptions and estimates as to future events* made by the Company's management that management believed were reasonable at the respective times the Management Projections were prepared, taking into account the relevant information available to management at the time the Management Projections were prepared.  *However, this information is not fact and should not be relied upon as being necessarily indicative of actual future results.*

Proxy 75 (emphasis added).

thing Wesco did not disclose is the inference that Plaintiff would draw from those disclosed facts—an inference that need not have been disclosed and that this Court has determined is unfounded.

## C.    Omission of The Preliminary Valuation Analysis is Not Actionable

Plaintiff also alleges that the Proxy contained material omissions in violation of Rule 14a-9 by failing to disclose the preliminary valuation analysis the Financial Advisors performed and presented to the Board on August 1, 2019.  *See* 2d Am. Compl. ¶ 15.  According to Plaintiffs, had Wesco disclosed the preliminary valuation analyses they would have shown a greater value for Wesco and thus demonstrated that—based on the Initial Management Projections—the Merger Consideration was unfair.

This allegation too fails to state a claim for relief.  "[T]he plain language of Rule 14a-9 requires a plaintiff to show both materiality and a false or misleading statement as a result of the omission."  *IBEW Local 98 Pension Fund v. Cent. Vt. Pub. Serv. Corp.* 2012 WL 928402, at *37 (D. Vt. Mar. 19, 2012).  "Disclosure of an item of information is not required … simply because it may be relevant or of interest to a reasonable investor."  *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002); *see also Sodhi v. Gentium S.P.A.* 2015 WL 273724, at *5 (S.D.N.Y. Jan. 22, 2015) (a disclosure statement "must contain only a 'fair summary' of the underlying bases for a financial advisor's fairness opinion").

Plaintiff fails to allege either a false or misleading statement or materiality.  The Proxy disclosed the Initial Management Projections.  It also disclosed the Updated Management Projections and that in preparing their fairness opinions, both advisors used the updated projections and assumed that they were the best currently available estimates and judgments of management.  Proxy 56; *see IBEW Local 98 Pension Fund*, 2012 WL 928402, at *12 ("where 'an adequate and fair summary of the work performed by [the financial adviser] is included in

the proxy,' and the plaintiffs 'failed to assert a colorable reason why management should be required to provide full versions of the projections underlying the already disclosed summaries,' a challenge to a proxy statement should be dismissed") (citation omitted).  To be sure, the Proxy did not disclose an opinion of a financial advisor based on the Initial Management Projections. But that is because there is no allegation that any such opinion was rendered—the advisors assumed that the updated projections and not the several months old initial projections represented management's then best judgment regarding Wesco's future results.  Wesco thus cannot be faulted for failing to disclose a fact or analysis that did not exist.  It left it to the shareholders themselves to conduct their own analysis if they believed, contrary to the views of management and the board, that the Initial Management Projections were the better set of projections.

**D.      The CEO Statement is Not Actionable**

Plaintiff's final allegation that the Proxy failed to disclose Renehan's discussions to remain CEO post-merger, 2d Am. Compl. ¶ 100, is meritless.  The challenged language is contained in the Proxy's discussion of the Background of the Merger.  In the description of the Wesco telephonic board meeting of August 1, 2019, the Proxy states in part: "The financial advisors summarized the key financial and other terms of Platinum's bid, which included an all-cash offer at a price of $10.42 per share, along with a request for a five-day exclusivity period, receipt of draft third quarter public earning materials and *discussion with Mr. Renehan and key members of the management team*."  Proxy 46 (emphasis added).  The discussion of the August 1, 2019 board meeting concludes with the report: "After discussion, the Board instructed the Strategic Alternatives Committee to continue to work with the Company's management and advisors to negotiate with Platinum and any other bidders that may emerge and come back to the Board after those discussions.  It was determined that the Company would not enter into any

exclusivity agreement with Platinum *nor would it allow for discussions between representatives of Platinum and management with respect to any employment, compensation, equity investment or similar matter at that time*." *Id.* (emphasis added).

Crediting the first portion of the Proxy discussion—that Platinum asked to speak to Renehan—but discounting the report of the response that the SAC would not permit such discussion, Plaintiff alleges "[i]t defies credulity to believe that Platinum and Renehan did not discuss his continued employment before the stockholder vote." 2d. Am. Compl. ¶ 100. Plaintiff notes that after the transaction closed on January 9, 2020, Renehan remained as CEO of the combined company. *Id*. ¶ 43.

This allegation, which is devoid of any factual material, is insufficient to permit this claim to go forward or to survive the motion to dismiss. *See JP Morgan Chase Sec. Litig*., 363 F. Supp. 2d at 626 (the PSLRA prohibits plaintiffs from pleading "the materiality of the alleged misstatements or omissions . . . in a conclusory or general fashion"). As Defendants note, the language of the Proxy reflects that the SAC did not allow Renehan (or any other member of the management team) to talk with Platinum "at that time." Proxy 46. Even assuming that Wesco had an affirmative obligation to report any discussions between Renehan and Platinum that occurred prior to the date of the Proxy, which the Court is prepared to assume for purposes of this motion, the Proxy was issued on September 13, 2019—a full four months before the merger closed and Renehan's appointment as CEO of the combined companies was announced. The Court notes that the Merger Agreement, whose terms are summarized in the Proxy and which is attached as an exhibit to the Proxy, did not require Platinum to retain Renehan as CEO nor did it make it a condition of closing or otherwise a term of the agreement that Renehan agree to stay as CEO. *See* Merger Agreement, Dkt. No. 26, Appendix A. Contrary to Plaintiff's argument, it is

thus entirely plausible that any discussions regarding whether Renehan would agree to stay with the combined company and whether Platinum would agree to continue to employ him occurred after both the parties and the shareholders had agreed on the Merger, and certainly after the September 13 date of the Proxy. Plaintiff cites no fact to the contrary.[13] *See Iqbal*, 556 U.S. at 678 ("to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when plaintiff pleads factual content that allows courts to draw reasonable inference that defendant is liable for misconduct alleged."); *Twombly*, 550 U.S. at 555 (2007) ("factual allegations must be enough to raise a right to relief above the speculative level.").

## E.     Plaintiff Fails to Plead Loss Causation

The Court starts with first principles that are binding on it.

First, a material misstatement or omission and loss causation are two separate, independent elements of a private Section 14(a) claim. *See Grace v. Rosenstock*, 228 F.3d 40, 47 (2d. Cir. 2000) ("loss causation . . . must be proven in the context of a private action under § 14(a)") (citing *Wilson v. Great American Industries, Inc.,* 979 F.2d 924, 931 (2d Cir. 1992); *Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 381–82 (2d Cir. 1974), *cert. denied,* 421 U.S. 976 (1975), *overruled on other grounds by Virginia Bankshares,* 501 U.S. at 1100 n. 9 ,

---

[13] This case is distinguishable on this score from *In re Willis Towers Watson PLC Proxy Litig.*, 937 F.3d 297, 301 (4th Cir. 2019), which reversed dismissal of a Section 14(a) claim premised upon a merged entity's CEO's conflict of interest. In *Willis Towers*, "plaintiffs' complaint . . . repeatedly allege[d] that [Defendant's CEO] . . . secretly negotiated [his] future compensation package." *Id.* at 305. Contrary to the instant case, the allegations in *Willis Towers* "[were] not bare allegations. Rather the plaintiffs alleged that [the CEO's of the merging entities] had a meeting on September 10, 2015 that was undisclosed to the . . . board or shareholders, that [the CEO of the acquiring entity] presented [Defendant's CEO] at that meeting with a written compensation plan, and that [Defendan't CEO's] final compensation after the merger was substantially similar to that plan." *Id.*

1100–06).  The existence of a material misstatement or omission, therefore, cannot by itself

establish loss causation.

Second, the "short and plain statement" required by the Federal Rules to plead loss

causation must provide the defendant with fair notice of the causal connection between the loss

and the misrepresentation.  Otherwise, the securities laws would "permit a plaintiff 'with a

largely groundless claim to simply take up the time of a number of other people, with the right to

do so representing an *in terrorem* increment of the settlement value, rather than a reasonably

founded hope that the [discovery] process will reveal relevant evidence,'" *Dura Pharm., Inc. v.

Broudo*, 544 U.S. 336, 346-47 (2005) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421

U.S. 723, 741 (1975)).  But the Court must examine the complaint as a whole in determining

whether plaintiff has satisfied that burden, *see Tellabs*, 551 U.S. at 322, focusing on the facts

pled and ignoring legal conclusions. *See Twombly*, 550 U.S. at 555-56 (2007); *Iqbal*, 556 U.S. at

678.

Third, the Second Circuit has held that plaintiffs in federal securities law cases are not

entitled to benefit of the bargain damages which are "unduly speculative and would result in a

windfall unrelated to" the loss they suffered.  *Barrows v. Forest Labs, Inc.*, 742 F.2d 54, 60 (2d

Cir. 1984); *see Kocourek v. Shrader*, 391 F. Supp. 3d 308, 332-33 (S.D.N.Y. 2019) (damages

must be based on the transaction actually struck); 15 U.S.C. § 78bb(a)(1) ("No person . . . shall

recover . . . a total amount in excess of the actual damages to that person on account of the act

complained of.").

Applying those principles, the Court concludes that the Complaint "stops short of the line

between possibility and plausibility of entitlement to relief."  *Iqbal*, 556 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 557) (internal quotation marks omitted).  Plaintiff's claim for loss

causation is based on the conclusory assertion that his "shares were worth significantly more than the Merger Consideration," a conclusion he asserts is based on the fact that the "Initial Management Projections indicated that stockholders' shares were worth up to $18.39, and the prices analysts indicated they believed would be warranted in a merger . . . significantly exceed the Merger Consideration and ranged as high as $18.00 per share." *See* 2d Am. Compl. ¶ 103. So stated, Plaintiff's claim is tantamount to the assertion of benefit of the bargain damages that the Second Circuit rejected in *Barrows*—an alternate reality where not only did the shareholders reject the merger, but also in which Wesco achieved all of the results that management prior to the third quarter results projected that it could achieve. It thus relies on "hypothesis about what the parties would have done if the circumstances surrounding their transaction had been different." *Barrows*, 742 F.2d at 60. Put another way, the Initial Management Projections were "not fact and should not be relied upon as being necessarily indicative of actual future results," Proxy 74, as the Proxy itself disclosed, and "reflect[ed] numerous variables, assumptions and estimates as to future events." *Id.* Wesco itself disclaimed any representation that it considered, even at the time of the Initial Management Projections, that "actual future results will necessarily reflect the Management Projections" and noted that they depended on assumptions or—in the words of *Barrow*—"hypothesis" both with respect to "general economic and industry conditions" and a large number of company-specific assumptions. *Id.* at 74-75.

To permit Plaintiff to recover damages on the assumption that had the Company remained independent, it would have achieved the results reflected in the Initial Management Projections, thus would give him a "windfall" wholly unrelated to the violation he claims. The choice put to Plaintiff individually and the Wesco shareholders collectively was not between the

Merger and the achievement of the Initial Management Projections (or any set of projections for that matter). As a matter of law, Plaintiff was not entitled to rely on the Initial Management Projections or any set of projections as a promise that Wesco would achieve those results. They were not guaranteed results. It follows, as a matter of plain logic, that the difference between the Merger Consideration and the imputed value of Wesco stock based on the Initial Management Projections is not "actual damages" to Plaintiff on account of the misrepresentation. 15 U.S.C. § 78bb(a)(1).

That conclusion is only reinforced by a review of the complaint as a whole and application of "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Equity in an independent company that achieved either the Initial Management Projections or the Updated Management Projections was not the alternative the shareholders forewent as a result of the merger vote. In the first instance, Wesco was a large public company whose common stock traded on the New York Stock Exchange. 2d. Am. Compl. ¶ 24. The market as a whole thus had access to the very same "in-depth knowledge of the Company and industry" based upon publicly available information that the Complaint ascribes to the analysts. And the Proxy reflects that the Merger Consideration was a significant premium to the value the shareholders themselves put on Wesco stock prior to the Merger announcement. Proxy 20. There is no allegation that Wesco traded in an inefficient market or that the stock-market-value of Wesco was otherwise distorted leading up to the merger. Thus there is no reason to doubt that that value—and not the fictional value Plaintiff ascribes to Wesco stock in the complaint—represented the true alternative to the merger consideration. *See Basic v. Levinson*, 485 U.S. 224, 246 (1988) (efficient market absorbs all publicly available information).

Second, Plaintiff does not make any well-pled allegation that the committee (and financial advisors) that led Wesco's auction process was compromised or ill-informed or ignored any potential bidder for the company.  From the factual allegations of the Complaint and the documents incorporated therein, the SAC reached out to a large number of potential bidders and, even when all other bidders dropped out, negotiated aggressively with Platinum before accepting an offer it determined was fair and presented to the shareholders.  Third, and finally, the complaint itself reflects that the Initial Management Projections were provided to all 14 parties with whom it entered a confidentiality agreement, and that none of them—all with presumably as much if not more knowledge than the analysts—decided that Wesco was worth the value Plaintiff ascribes to it based on the Initial Management Projections.  12 of them decided, after reviewing the Initial Projections and other company information, not to pursue any transaction at all.  The only actual offer Wesco received was from Platinum, which expressed concern in the negotiation process that Wesco's Third Quarter results were "lower than projected and that the increasing margin pressures on the business outweighed the benefits of the anticipated synergies . . . ," Proxy 47, and was not willing to bid above the Merger Consideration after three rounds of back-and-forth.  *Id*.

In so holding, the Court expressly does not rely on the theories proffered by either Plaintiff or Defendants, which both prove too much.   Plaintiff argues that loss is sufficiently evidenced by the foregone value Wesco would have had had it remained independent and achieved the Initial Management Projections.  Pl. Opp'n at 24-26.  It relies on *Azar*, 2017 WL 1055966, at *10-11 and *Baum*, 408 F. Supp. 3d at 92.  Indeed, these cases support Plaintiff's theory.  *See Azar*, 2017 WL 1055966, at *11 (sustaining a claim where Plaintiffs alleged "that [a set of earlier projections] provided a more optimistic and more accurate assessment of the

Company's financial prospects than did [the later projections cited in a proxy statement]")[14];
*Baum*, 408 F. Supp. 3d at 92 (finding loss causation adequately pled where earlier an early set of
management projections "produced a price . . . greater than . . . [what] shareholders ultimately
received" and holding that a plaintiff need not set forth a damages model at the pleading stage).

      That theory is not supported by the law and would improperly result in the windfall
damages prohibited in *Barrows*.  742 F.2d at 60.  It also would deprive loss causation of any
independent meaning or force in every case in which management updates in a negative way the
projections the financial advisors rely upon, resulting in the very "groundless lawsuits" seeking
"*in terrorem*" settlements against which the Supreme Court warned in *Dura Pharmaceutical*.
544 U.S. at 346-47.  Delaware law encourages companies to consult the most up-to-date
information before making a recommendation on a transformative transaction.  *See, e.g. Ryan v.
Lyondell Chem. Co*., 2008 WL 4174038, at *2 (finding bad faith where the board was "*generally
knowledgeable* about the value of the Company . . . [but] made *no apparent effort* to arm
themselves with *specific knowledge* about the present value of the Company [leading up to a
merger]") (emphasis original); *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001) ("Where
the board issues a Consent Solicitation Statement in contemplation of stockholder action, the
board is obligated to disclose fully and fairly all material information within the board's
control") (quotation and citation omitted).  It also encourages companies to disclose any
projections they have in the context of a cash-out merger if those projections could be considered
to be "reliable enough to aid the stockholders in making an informed judgment."  *PNB Holdings*,

---

[14] Although notably, the *Azar* Court also cited Plaintiff's reliance, in pleading loss causation, on
"the Company's growth [leading up to the transaction], management's statements that they
expected the Company's performance to improve, and management's affirmation of . . . year-end
targets."  *Id*.

2016 WL 2403999 at *16.  This applies both to an initial set of projections and the projections

that were relied upon.  After all, even though the Board did not rely upon the earlier projections,

a shareholder might want to see them to make an informed judgment.  It is not unusual—and,

indeed is advisable under Delaware law—for a company in Wesco's position to update its

projections and to disclose them, alongside the earlier projections.  That is what Wesco did.  It is

conceivable in some future case that a plaintiff may be able to come up with a different theory of

loss causation.  But if Plaintiff's theory here were accepted, it would lead to a lawsuit in every

case where the more up-to-date information is negative rather than positive—that is the kind of

result that *Dura Pharmaceuticals* expressly instructs the courts to try to avoid.

On the other hand, Defendants' theory taken on its face and in its more extreme fashion

would also seem to prove too much.  Defendants cite cases for the proposition that in order to

show loss causation the Plaintiff must plead the immediate availability of an alternative, more

favorable transaction to the transaction approved in the merger.  *See* Def. Br. at 23-24 (citing *In

re Tangoe, Inc. S'holders Litig.*, 333 F. Supp. 3d 77, 109 (D. Conn. 2018); *Trahan v. Interactive

Intelligence Group, Inc.*, 308 F. Supp. 3d 977, 1000 (S.D. Ind. 2018)).  This theory appears to

impose too high a burden on the plaintiff who votes in favor of a merger based on a misleading

proxy and fails to ascribe the value to the shareholder vote mandated by Section 14(a) and the

Supreme Court's decision in *Affiliated Ute*.  *See Affiliated Ute Citizens of the State of Utah et al.

v. United* States, 407 U.S. 916, ("Congress intended securities legislation enacted for the purpose

of avoiding frauds to be construed not technically and restrictively, but flexibly to effectuate its

remedial purposes.") (citation and quotation omitted).  In the instant case, although there was no

alternative *transaction* available, the Company nonetheless had two choices before it: to be

acquired by Platinum or to remain independent.  Thus, the fact that Plaintiff is not able to point

to a specific merger or other transaction Wesco forewent as a result of the merger vote should not in itself be fatal to its claim of loss causation; it is not logically or legally impossible that the decision to be acquired could cause a loss compared to the decision to remain independent. Rather, what is fatal to Plaintiff's claim is the failure to allege facts plausibly establishing that the foregone alternative—an independent Wesco—would have created more shareholder value than the Platinum Merger.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the complaint in its entirety is GRANTED without prejudice.

SO ORDERED.

Dated: April 16, 2020
      New York, New York

                                 LEWIS J. LIMAN
                           United States District Judge